William E. Pollock, Appellant, *v.* Clara Pollock, Respondent.

In an action for a divorce, *a vinculo,* defendant's answer contained recriminatory allegations of adultery by plaintiff. The issues were sent to a referee to take the testimony and report the same with his opinion thereon. The referee reported that, in his opinion, defendant was guilty of the adultery charged, but that plaintiff was not guilty. The decision of the Special Term stated that the court found plaintiff guilty of the adultery "as charged in the answer," and directed that the complaint be dismissed. *Held,* that this was a sufficient compliance with the provision of the Code (section 267), requiring that, upon trial by the court, its decision shall contain a statement of the facts found, and the conclusions of law separately.

The finding of a material fact where there is a total absence of evidence to sustain it, is error of law, reviewable in this court upon due and proper exception.

Where, in an action for divorce, *a vinculo,* recriminatory charges are made in the answer, no less evidence is required to establish such charges than is required to establish a like charge in an original action for divorce.

Although presumptive evidence alone is sufficient to establish the fact of adulterous intercourse, the circumstances must lead to it, not only by fair inference but as a necessary conclusion; appearances equally capable of two interpretations, one an innocent one, will not justify the presumption of guilt. Evidence simply showing full and frequent opportunity for illicit, carnal intercourse, is not alone sufficient to found an inference that the criminal act was committed.

General cohabitation alone — *i. e.,* the simply living or being together all or most of the time in the same household, apart from suspicious circumstances characterizing it, is not sufficient to warrant an inference of adultery; there must be some accompanying circumstances fitted fairly to induce a belief that it was not for a proper purpose.

To support recriminatory charges in an action for divorce, brought by the husband, evidence was given to the effect that the alleged paramour was almost daily at the apartments occupied by him both as his residence and place of business, and sometimes in the evenings ; that at times they were on the street together and went to places of amusement; that she consulted with him as to, and made purchases for the table, and at times did the housework in the absence of the woman employed for that purpose. It also appeared that the female had been, from an early age, in plaintiff's family ; that she was at the time employed as an assistant in plaintiff's business. There was no evidence of any improper endearments or familiarities of any kind between the parties, *held*, that the evidence was not sufficient to sustain the charges.

Also, *held*, that the facts that the female charged to be the paramour of plaintiff was believed by his neighbors to be his wife, and was twice addressed as such, in the absence of proof that she knew herself so considered, or heard herself so addressed, she testifying that she did not, was not, in connection with the other facts, sufficient to justify a finding that the parties cohabited together as husband and wife.

A party who presents a witness thereby asserts or admits his credibility ; and while such party may show his witness to have been mistaken, he cannot impeach or assail him.

The rule that the evidence of a paramour or other accomplice is to be listened to with caution, and should be corroborated, only applies when the witness admits the criminality alleged, not where such witness appears only in obedience to process and denies any criminality.

(Argued September 26, 1877 ; decided November 13, 1877).

APPEAL from a judgment of the General Term of the Supreme Court, in the second judicial department, affirming a judgment in favor of defendant entered upon a decision of the court at Special Term.

The nature of the action and the facts are set forth sufficiently in the opinion.

*W. A. Beach*, for appellant. The finding of a material fact wholly without evidence to sustain it is an error of law, and upon exception is reviewable in this court. (*Mason* v. *Lord*, 40 N. Y, 477; *Draper* v. *Stowvenal*, 38 id., 219; *Duffy* v. *Masterson*, 44 id., 557; *Murray* v. *Harway*, 56 id., 346; *Hobart* v. *Hobart*, 62 id., 80, 81.) Adultery could not be justly or legally imputed to plaintiff from the evidence. (2 Greenl. on Ev., § 40; Bishop on Marriage and Divorce, §

422; *Ferguson* v. *Ferguson*, 3 Sandf., 307; 1 Barb. Ch., 604; *Zorskowski* v. *Zorskowski*, 27 How. Pr., 37; *Meyers* v. *Meyers*, 41 Barb., 114; *Lyon* v. *Lyon*, 62 id., 138; *Hart* v. *Hart*, 2 Edw. Ch., 207; *Fordham* v. *Smith*, 44 How. Pr., 475.)

*Thomas Carey* and *Robert S. Hudspeth*, for respondent. The legal presumption is that the decree appealed from is correct. (*Williamson* v. *Fields*, 2 Barb. Ch., 28.) The referee's report as to a question of fact being manifestly against the weight of evidence, the court of original jurisdiction had the right to set it aside. (*Foster* v. *Colman*, 1 E. D. S., 85; *Brooks* v. *Christopher*, 5 Duer, 216; *Griffin* v. *Marquardt*, 17 N. Y., 28; *Hoyt* v. *Thompson*, 19 id., 207.) This court will not set aside a referee's report as against evidence, or as based on insufficient evidence. (*Warner* v. *Tooker*, 3 Cow., 387; *Rens. Glass Factory* v. *Reid*, 5 id., 587; *Feeters* v. *Heath*, 11 Wend., 477; *McPherson* v. *Cheadell*, 24 id., 15.)

FOLGER, J. This case comes up in a peculiar form, and it is first necessary to inquire if it is correctly brought before us on appeal, and what our power is in regard to it.

The action was brought by the plaintiff, the husband, for a divorce from the defendant, his wife, on the ground of her adultery. The defendant answered, denying the allegations of her adultery, and making recriminatory allegations of adultery by the plaintiff. The issue being thus joined, it was sent to a referee to take the testimony, and to report the same to the court, with his opinion thereon. He reported the testimony taken by him, and that, in his opinion, the defendant was guilty of adultery, as charged in some of the allegations of the plaintiff's complaint; that the plaintiff was not guilty, as averred in the recriminatory allegations of the answer; and that the plaintiff should have judgment dissolving his marriage with the defendant. He gave no judgment. He had no power to give any.

On the report coming up to the Special Term, it was not

confirmed. The decision of the learned justice who held that term states that the referee had not found as to the plaintiff's guilt. This is manifestly an error in the manuscript of the decision. It evidently was meant to be written that the referee has not found correctly as to the plaintiff's guilt. The decision of the learned justice was further, that from the evidence returned, he found that the plaintiff was guilty of adultery as charged in the answer, and that the complaint be dismissed. This decision, so brief and concise, doubtless is a sufficient compliance with section 267 of the Code. It does not, literally speaking, contain a statement of the facts found. It refers to the charges of fact in the answer, and finds them to be true, and adopts them as the facts found. The conclusion of law is that the complaint be dismissed. There was an exception to this decision, and the finding in it. The exception is not happily expressed. It may, however, be construed to mean that the exception is to the finding as matter of law, and to the decision that the complaint be dismissed as a conclusion of law from the finding. If the finding of facts (viz., that the plaintiff was guilty of adultery as charged in the answer), is correct, clearly the conclusion of law is also correct. So that the only exception which will need to be considered is that to the finding of fact. That exception, we have seen, may be construed as being that it was an error in law, to find the plaintiff guilty of adultery, inasmuch as it was wholly without evidence to sustain such a finding. It is an error of law to find a material fact, when there is a total absence of evidence to sustain it; and that error of law is reviewable in this court, upon due and proper exception. (*Murray* v. *Harway*, 56 N. Y., 337, 346; *Duffy* v. *Masterson*, 44 id., 557; *Mason* v. *Lord*, 40 id., 477.)

The judgment of the General Term, affirming that of the Special Term, is open to the same inquiry.

We are, therefore, obliged to look into all the testimony, and see if it presents any evidence to uphold a charge of adultery against the plaintiff.

We first remark, as prelude to stating what is needed to

be in evidence to uphold that charge, that since the close of the proofs, it has not been capable of dispute in the case, that the proof is amply sufficient to convict the defendant of the adultery charged against her by some of the allegations of the complaint. The plaintiff would then be entitled to a decree of divorce *a vinculo* upon the merits, unless he is also shown to have been guilty of a like act. (2 R. S., p. 145, § 42, sub. 4.) Though it has been said in England, that the general conduct of the husband, when plaintiff in action seeking a divorce, is quite sufficient to support a plea in bar, though insufficient to support an original accusation of adultery ; (*Forster* v. *Forster,* 1 Hagg. C. R., 144; this has not received entire acceptation there; *Turton* v. *Turton,* 3 Hagg., 338; *Goodall* v. *Goodall,* 2 Lee, 384 ; *Sopwith* v. *Sopwith,* 2 Swab. & T., 160.) And the language of the Revised Statutes, above cited, indicates that no less evidence should be required to make -out a bar resting upon recriminatory charges, than would be to establish a like charge in an original action for divorce. It is, as to that, a fundamental rule in such actions, that nothing short of the carnal act will lay the foundation for a divorce. (*Hamerton* v. *Hamerton,* 2 Hagg., 8.) And though it is an act of darkness and great secrecy, and not often provable by direct means, and the evidence must in most cases be circumstantial, yet the circumstances must be sufficient to satisfy the mind that the adulterous intercourse has actually taken place. Though presumptive evidence alone is sufficient to establish the fact, the circumstances must lead to it, not only by fair inference, but as a necessary conclusion. Appearances that are equally capable of two interpretations will not justify the presumption. (*Loveden* v. *Loveden,* 2 Hagg. Cons. R., 3, 4.) And see how far this rule has been relied upon and has controlled a court, in *Collett* v. *Collett* (1 Curtiss' Ecc., 678, 686, S. C., reversed on appeal by the judiciary committee of the Privy Council; see Wadd. Dig., 38), where the fact that a wife was tainted with the venereal disease, she being the complainant in the suit, was held to be as well consistent with her own adultery,

or a contraction of the disease by accident, as with contagion with the husband.    The court is not warranted in a conclusion of criminality, when all that is proved is susceptible of a construction of innocence.    (*Hamerton* v. *Hamerton*, 2 Hagg., 13.)    Still less can it make inferences without actual facts to support them.    (*Williams* v. *Williams*, 1 Hagg. Cons. R., 299.)    We dwell longer on these general principles, for the reason that the evidence brought by the defendant, which is relied upon to sustain her charge, is entirely circumstantial, and can be potent against the plaintiff only by the aid of inferences from the facts it establishes, not in themselves necessarily criminatory.

It is clear that the plaintiff had opportunity for carnal intercourse with the female, who is alleged to have been his paramour, in that he was with her in the same set of apartments, which were his, in the day-time and in the night-time. He has, beyond doubt, been alone with her therein in the day-time, and as late as after six o'clock in the evening.    It must not, however, be understood that the female was continuously in the apartments of the plaintiff by night.    A witness (Erastus H. Winchester), has seen the alleged paramour of the plaintiff go in and out of plaintiff's rooms as other people did, in the morning and evening, every day probably; as a matter of opinion, as early as seven o'clock in the forenoon, dressed well, with her hat on, and go away at sundown in the same attire ; and has seen the plaintiff go out with her once or twice ; and has seen her go out of the house in the morning.    Another witness (Louise Egenzinger), testified that she had seen the female enter the house of plaintiff, No. 501 Third avenue, Brooklyn, as late as eleven o'clock P. M., with the plaintiff, and did not see her go out that night; that this was Saturday night, and more than once. The only permissible inference from the last statement is, that it was twice ; for in these cases, the charge of adultery is in effect a criminal one, and if there be any doubt the accused party is entitled to it.    (*Dillon* v. *Dillon*, 3 Curtiss; 7 Eng. Ecc. R., 377–391.)    The witness was asked then, if

she had seen her there the next Sunday morning. She does not answer clearly and specifically. She says, in reply, on Sunday and other week-day mornings. If she had answered that she had seen her there on the next Sunday morning, after the entrance into the house late on the prior Saturday night or evening, there would be ground for the inference that she had remained in the house all that night. The same witness testifies to that female being there on a Sunday morning, dressed up, and in a wrapper, fixing flowers, alone, and with the plaintiff. The Sunday morning is not specified, so that we may not know that it was next after one of the two Saturday nights mentioned. The hour in the morning is not given, so that we may not know that it was so early as to give an inference that she did not come to the house from without, that day. The nearest to fixing the hour by the witness is by saying, that it was at different hours of the day, and that she has seen her there mornings when the witness got up ; whether week-day mornings or not does not appear; nor how early it was when the witness got up on those occasions ; this witness lived next door. Another witnees (Mary Ward), testified that she heard the female singing in the same house as late as 11 P. M., but did not see her there, and did not take notice of her going out. This witness was satisfied that it was that female singing, because she never saw any other lady in the house. The witness lived in the same house, in rooms over those of the plaintiff, for one week, but does not know that this female ever stayed there all night. Another witness (Mary Jane Winchester), had seen that female at the plaintiff's same house as late as half-past seven, but never after dark ; had seen the plaintiff and her get out of the cars and go into that house one Saturday evening, about seven o'clock, as the witness was going to meeting ; and would see her there for the first time in the morning as early as half-past nine till ten o'clock, when she would be dressed neatly. Another witness (Catharine Leopold), has seen her go into that house from nine to eleven A. M.; has never seen her go in at night ; but has seen her go

away with the plaintiff from eight till eleven. This witness lived next door. It will be noticed that this testimony all related to the rooms of the plaintiff at the street and number above named. The female, Emma Halpin, was herself called as a witness by the defendant; and all the inculpatory testimony she gave upon this matter of plaintiff's opportunity at that house, is this: That she has been there most every day, went home at six o'clock, but has been there until nine o'clock at night; has been there on Sundays twice only. She and the plaintiff have been alone in the house after six o'clock in the evening, and the plaintiff has taken her to theatres; not often. Another witness (Wm. Lebold), who resided next door to the plaintiff in Third avenue, has seen a lady there; sometimes in the morning, sometimes at noon; and once saw her and the plaintiff walking together in the street, about eight P. M., but does not identify the lady as Miss Halpin.

This I believe to be a full statement of all the testimony of opportunity, which can be said to be damaging to the plaintiff, at the house No. 501 Third avenue, Brooklyn. He had before that resided in Seventeenth street, in the same city. The only testimony as to opportunity at that place is by Miss Halpin, who says that she has stayed in his house over night on a great many occasions.

I do not remember any other testimony on this head in the case. In my judgment, all that it proves is this, that if the plaintiff and Miss Halpin had been so inclined, there was full and frequent opportunity for them to have yielded to their appetites, and to have had illicit carnal intercourse. This alone, that there was opportunity, is not enough for a court to found an inference upon, that the criminal act was done. And it cannot be claimed that, without an inference, there is any proof of impropriety of conduct. I am aware that it has been said that general cohabitation is enough to found the inference. (*Loveden* v. *Loveden, supra.*) But it was a general remark, and to see what effect should be given, it should be noted in what connection it was made. It was uttered as a corollary to the statement, that circum-

stances need not be so specially proved as to produce the
conclusion that the fact of adultery was committed at a par-
ticular hour, or in a particular room. In that connection it
means, that if a general cohabitation is proven, and the cir-
cumstances in which it was shown to have existed, lead to
the conclusion that at some time not definitely shown, during
the term of the cohabitation, and at some place in the local-
ity of it not specifically proven, there was the illegal act; that
more particular proof of day and spot will not be exacted.
*Cadogan* v. *Cadogan* (a case unreported to my knowledge,
save in a note to the case last above named), is cited, where,
in the opinion, the circumstances are recited, and it is there
said: "Mere cohabitation *in this way*, must, in itself, be
held sufficient to found the judgment of the court." *Rutton*
v. *Rutton* is also there cited, and the expression is quoted
from it in *Cadogan* v. *Cadogan*: "That general cohabita-
tion excluded the necessity of the proof of particular facts."
The facts of the case are not given with any minuteness.
It will not do to take it as an authority, that where nothing
more is proved than merely the being together in the same
house, or set of apartments, even if alone together some part
of the time, that it is sufficient without some other consider-
ations, to found an adjudication of adulterous conduct.
What those other considerations are, and should be, is shown
by *Chambers* v. *Chambers* (1 Hagg., Cons. R., 439),
*Dunham* v. *Dunham* (6 Law Reporter, 139.) And it is evi-
dent, that going with the fact of general cohabitation, either
to mollify or confirm it, must be the particular considerations
arising out of the condition and rank in life of the parties,
the habits of conduct of them and their equals in society
(what is sometimes called the general manners [Poynter
on Mar. and Div., 187]), the domestic relations which each
of them maintain with their own kin, the secluded or open
and avowed place of cohabitation, the avocation of the parties,
and what demand it makes for constant or frequent inter-
course, and all other things which go to show that the living
or being together is or is not necessary, reasonable, and

compatible with innocence. I doubt whether a case can be found, in which it has been held, that general cohabitation alone, apart from suspicious circumstances characterizing it, was enough to warrant an inference of the fact of adultery. The cohabitation here spoken of is the living or being together all or most of the time in the same household ; not the living together ostensibly as husband and wife. In *Hart* v. *Hart* (2 Edw. Chy. R., 207), a husband was living separately from his wife, and had a woman residing with him. No other cohabitation (*i. e.*, no cohabitation in the technical meaning, living together as man and wife, from *cohabitare* of the old English law), was shown. The vice-chancellor said that the court would not grant a decree in such a case upon conjectures, and that he must have stronger testimony before he made a decree. That case is questioned by Mr. Bishop in one edition of his text-book on Marriage and Divorce (the fourth edition, 646, [*453]), but I find no disapproval of it, nor any comment upon it in any judicial opinion in this State, and Mr. Bishop has suppressed his unfavorable comment in a subsequent edition. (5th ed., § 628). My judgment concurs with that of Vice-Chancellor EDWARDS. I think that proof of the parties charged, being alone together in a set of rooms at times, and passing many days in succession together there, and some evenings, is not of itself sufficient to sustain the allegation. There should be some accompanying circumstances, fitted to fairly induce a belief that it was not for a proper purpose. The being thus together, to be sure, gives opportunity. There must be more than that; some circumstances to show a disposition to avail themselves of the opportunity, and to ground an inference that they have actually done so. (*Harris* v. *Harris*, 2 Haggard, 376.) The court must be satisfied that a criminal attachment subsisted between the parties, and that the parties intended to indulge in the intercourse for which they had opportunity. (*Davidson* v. *Davidson*; D. & S., 132, 135; *Dunham* v. *Dunham*, *supra*; *Burgess* v. *Burgess*, 2 Hagg. Cons. R., 228.) Even the repeated going of a married woman to the private

rooms of an unmarried man, who was the alleged paramour, was not held enough without evidence of improper conduct while there, to warrant judgment that the adulterous act had been committed. (*Williams* v. *Williams*, *supra*; and see *Westmeath* v. *Westmeath*, 2 Hagg. Supp., 1; 4 Eng. Ecc. R., 238–244.) It cannot escape the attention on a perusal of the testimony, that no witness speaks of an act, or gesture, or word or look, of indecent or even of undue familiarity, on the part of either the plaintiff or Miss Halpin towards the other. Though the rooms in which they were shown to be together were the place of his business, and it is shown that people went in and out there frequently; that other females went there, one of whom is designated by name; that there was a boy employed there by the plaintiff, whose name and residence are given; that a woman whose name and residence were given, was used to go there to do housework; though the occupation of Miss Halpin while there was open to the observation of the witnesses; there is no proof of a kiss, or an embrace, or a contact or nearness of person, or an endearment of any kind, or of a surprise in an equivocal situation, or of confusion of face on a sudden entrance, or anything clandestine in conduct, or which showed a desire for secrecy or concealment. (See *Dunham* v. *Dunham*, 6 Law Reporter, 139, 141.) Here is opportunity existing for at least three years, with the parties directly in the notice of the witnesses, who are of a class not likely to avert their faces if anything suspicious takes place, or to refrain from comment upon it, and not a single hint in the testimony that the usual signs were given that the opportunity was availed of. It is contrary to the usual experience of mankind, not only as gathered in one's own observation, but as disclosed by the reports of such cases, that if such relations existed between these two persons as are charged, they should not, at some time during the period, have incautiously or recklessly betrayed the fact by some of the means above specified. If the opportunity merely, is shown, there being no evidence of the will to improve it, this does not justify the inference of guilt; it

must be further shown that the parties were together under suspicious circumstances, not to be easily accounted for unless they had the corrupt design. (*Mayer* v. *Mayer*, 6 C. E. Green [N. J.], 246.) It appears that the defendant was not unapprised of the importance of making proof thereof. One who testified to their walking together in the street, was asked if they walked arm in arm, but could not say that they did. Another witness was asked if she ever had seen the plaintiff kiss Miss Halpin ; but answered that she never had.

There were some facts testified to which may be claimed as giving color to the intercourse between them. It is shown, in general, that the neighbors looked upon Miss Halpin as the wife of the plaintiff, and spoke of her as Mrs. Pollock. One says that his opinion was based upon no particular circumstance, except, perhaps, that he saw her up in the plaintiff's rooms. Another witness said that she looked upon the woman as the plaintiff's wife, but never saw any actions inducing thereto, except that she attended to housework. Another witness knew her as Mrs. Pollock, and had spoken to her by that name, but seems to have based her thought and speech upon the fact that she was the only woman there with the plaintiff. Another witness had called her Mrs. Pollock, but received no answer, and also testified that she was known as Mrs. Pollock in the neighborhood. Another witness testified that he has heard her spoken of as Mrs. Pollock, and that his family always supposed that she was such, but that they were not personally acquainted with her, and he names his wife and daughter only, who were members of his family, as having spoken of her thus. He says that from all that he heard from them, he had no doubt that she was Mrs. Pollock. He says that there were other circumstances that made the impression, but he was not asked to, nor did he state them, so that we are left in the dark as to them. It is clear that she was thought by the neighbors to be the wife of the plaintiff. It is not clear why that was so. There are but two circumstances given for the opinion. One is that

she did housework. Another is that she was spoken to by the married name, on two occasions, which are specified, at one of which she made no reply, and at the other replied, not as to the name, but as to the thing then asked for. Now it is to be observed of this testimony, in the first place, that it does not appear that the plaintiff ever knew that she was spoken to, or of, as his wife, or that she was so considered. He is not to be affected by those facts without such knowledge. In *Williams* v. *Williams* (*supra*), the alleged paramour was named Thomas. He had spoken of a female, who was wont to visit him at his private rooms, as his wife, and had named her, in speech of her, as Mrs. Thomas. It was alleged that this female was the defendant. As it did not appear that the defendant herself ever knew that she was so spoken of, it was held not to be enough. On the strength of this authority, and on the reason of the matter, this proof is not of sufficient weight against the plaintiff. The only effect of it would be upon the female. It would show, if she knew of it, that she was not as sensitive as she ought to be to a false supposition, by which a pure and delicate character would be alarmed, and would seek to correct. But it does not show this, unless she heard herself so addressed ; and she testified that she never heard any one call her Mrs. Pollock, and it is not shown that she knew of the opinion as to her in the neighborhood. To one witness who so spoke to her she made no answer; the inference would be that she did not hear. The other witness is positive that she did hear her. But it appears that Miss Halpin was then engaged in her usual occupation of painting photographic pictures; that the witness asked her, at the time, for warm water, and the reply by Miss Halpin was, "certainly; take all you want." It was only from the reply that the witness is positive that she heard herself spoken to as Mrs. Pollock. The reply shows no more than that she heard water asked for, though the inference might be, that if she heard that, she also heard the other. Bear in mind, however, that she was at her work, and that it is possible that the subject-matter

of the request was what she was alone conscious of. We are bound to reconcile her testimony—that she did not ever hear the appellation which was applied to her—with that of the witness who is positive that she did. It may be done as above pointed out.

I have not thought it necessary to consider whether the testimony on this point was admissible ; or, if it was not, whether the exception to the reception of it by the referee is available here.

It is, also, shown that this young woman did various acts of household occupation in plaintiff's rooms, and for him, viz.: buying meats in company and conference with him, and for him in his absence, and cooking meats, and washing dishes, and making up beds—his with the rest. This undoubtedly showed entire ease and unconstraint in the house, and great familiarity. If done by a female who had lately come into relations with the plaintiff, or whose relations were only those of a social acquaintance, or if the parties were in the higher or more refined classes in life, it would be quite significant. But it appears that she had known the plaintiff from the time that she was twelve years old ; that she had been in his employ ever since she was fourteen years of age, and that she had lived in his family for about a year. Her relations to him were not those of a social acquaintance only, whose lack of reserve and formality of intercourse might give ground for remark or suspicion ; they were those of a dependant, in some degree—of a former servant, who was still an actual employe; they were based on a more familiar footing, and they were innocently consonant with more familiarity of action in his household affairs. Besides, she and he were in that rank of life, and in that actual condition as to estate, where persons are bred to, and compelled by necessity to help themselves, and to help each other in the matters proven. Again, it was not as an ordinary or continuous thing that these acts were done. There was a woman who usually came to make the beds. The cooking was for her (Halpin's) own eating, at her bench.

She never cooked breakfast there; which tends to show that she was not there in the early morning. I am not able to look upon these acts, under the circumstances about the parties, as ground for a reasonable suspicion of ill-doing.

It is also shown that the plaintiff has walked in the streets with her and taken her to the theatres in Brooklyn and New York, not on a great many occasions, and generally brought her home when the theatre let out, but not for over a year and a half before the hearing. He had made presents of books at Christmas, and a writing desk six years ago, when his wife was living with him, and Halpin lived in the family with them as a servant.

These are not circumstances for reasonable suspicion, or coloring their intercourse with a hue of evil.

But on the other hand, the mode of life of these persons, which furnished opportunity for immoral conduct, is, under the circumstances shown, entirely consistent with good behavior and purity of character. It is more than capable of two interpretations, in the language cited in the first part hereof; it is more capable of an interpretation favorable to them than against them. The plaintiff was engaged, as a business, in some branch of the photographic art, and carried it on at these rooms. Halpin was in his employ therein, and did what the witnesses called painting. This, of necessity, took her to his rooms daily on every week-day, and kept her there during the working hours of the day. They could not help but be together there, or in the same set of rooms, at the same time. Here is reason and cause sufficient, and not only sufficient, but the most natural to be ascribed, for the association of these persons during the week days. This association might produce an esteem for each other, without carrying that esteem within the bounds of illicit passion. And this would account for the evenings spent together, and for the Sundays passed at his house, as naturally as to attribute them to the warmth of appetite — the more especially as no indications of that warmth have ever been seen by the witnesses. We are not left to this alone. The defendant

called Halpin as a witness, and produced her sworn testimony to the court. The defendant may not now say that Halpin is untruthful and unworthy of belief. She has presented her as a credible witness. That Halpin has been mistaken in her testimony may be argued, and may be shown by that of other witnesses. (*Melhuish* v. *Collier*, 15 Ad. & Ell. N. S. [Q. B.], [69 Ec. L. R.], *878.) She may not be impeached or assailed. It is fair to judge a party by his own witness. (*Dillon* v. *Dillon*, 3 Curteis, 86; 7 Eng. Ec. Rep., 377–388.) If a party puts upon the stand a witness who is for any reason assailable, that party asserts or admits the credibility of that witness. (*Per* The Chancellor in *Varick* v. *Jackson*, 2 Wend., 166–201; *Thompson* v. *Blanchard*, 4 N. Y., 303–311; *Fordham* v. *Smith*, in Mem., 46 id., 683; more full 44 How. Pr. R., 472.) I am aware that the evidence of a paramour, it is said, must always be corroborated, and is to be listened to with caution. But that is where the witness avows herself or himself the paramour, and comes into court to testify to, and in fact testifies to the commission of the carnal act. It is the same rule which recommends care and suspicion in receiving the testimony of any professed accomplice in a criminal act, and does not apply where the witness appears only in obedience to process and denies the criminality alleged, and does not come as an accomplice. Halpin testifies, indeed, that she stayed in the plaintiff's house in Seventeenth street, Brooklyn, over night on a great many occasions, when she most always slept alone, though ladies, sisters of the plaintiff, have slept with her. Besides, for a portion of that time, she had scarcely reached the age of puberty. The question is asked her whether the plaintiff ever slept in the same bed with her. She replies: No sir; never. The question is repeated: Never at any time? She replies: Never at any time. As the counsel for the defendant had the witness in his hands, he was not confined to an inquiry as to these persons sleeping in the same bed together, but might have pursued it, so as to run down all the modes by which the guilty act might

have been committed. So that we have the right to weigh this answer of Halpin, as equivalent to a denial of carnal knowledge of her person at all by the plaintiff. She also speaks as to other matters, and explains the occasions of her being at the house on two Sundays, saying they were but two, showing that once she was with the plaintiff's daughter there; but who was there on the other day, she does not remember. She denies being there in the evening later than nine o'clock. It is needless to go further into the details of the testimony given by her. It is enough to say that it not only does not give proof of any act of guilty conduct, but it affirmatively explains the weak incidents which had been shown by other witnesses, and makes them consistent with propriety of conduct, and entirely natural in the justifiable relations existing between her and the plaintiff.

On the whole case; which I have gone into at such length as was demanded from the nature of the exception taken, and the point made in this court; I am convinced that a due regard to the rules laid down by high authority for the disposition of cases of this kind, will not warrant a conclusion that the plaintiff was guilty of adultery with the witness Halpin as charged in the answer. There is no evidence to sustain the finding of that fact by the Special Term. All the evidence is, to say the least, capable of two interpretations. It is seen, that the only direct proof is of opportunity; that there is no direct proof of the fact of adultery; and that it is found to have been committed only upon inferences from the fact of opportunity, and from some circumstances attending. The circumstances, which are the most urgent, are, upon the authorities cited, insufficient to warrant an inference of a guilty act, and without the aid of inference there is no proof. Insufficient evidence is, in the eye of the law, no evidence. "When we say that there is no evidence to go to a jury, we do not mean literally none; but that there is none that ought reasonably to satisfy a jury, that the fact sought to be proved is established;" (*Per* MAULE, J., *Jewell* v. *Poor*, 13 C. B., 916; E. Com. L. Rep., 76.)

This leads to a reversal of the judgments of the General and Special Terms. It would also lead to a judgment for the plaintiff of divorce *a vinculo matrimonii,* but for the interposition of an act of the Legislature passed last winter. (Laws of 1877, vol. 1, chap. 168, pp. 176–180.) By that act, amending section 42, 2 Revised Statutes, p. 145, it is provided, that in a suit brought for divorce by reason of adultery, judgment shall not be rendered for the relief demanded, until the plaintiff shall have produced to the court, satisfactory proof that there is no judgment or decree for a divorce, upon the ground of adultery, against the plaintiff, in favor of the defendant, in any of the courts of this State. That act was passed April 20, 1877, and by its terms took effect immediately.

The case must be sent down again for the plaintiff to make the proof required. And there is no reason why the parties should not be allowed to make further proof, if they are so advised, upon the main issues in the action.

All concur.

Judgment reversed.