PFEIFFER *v.* PFEIFFER.

*(Superior Court of Buffalo, Trial Term.* September, 1889.)

DIVORCE—ADULTERY—EVIDENCE.

     In an action for divorce on the ground of adultery with one P., a witness testified that, before defendant's marriage, P. called on her several times, and they went away together; that defendant returned before 10 P. M., and said she had been riding with P., and had drank wine, etc., at a certain saloon, which was a respectable place. Another witness testified that, after the marriage, she saw a man call at defendant's apartments twice, when plaintiff was not there, and remain about an

hour each time. Witness did not know of any other person's being there at the time, and could not identify the man as P., though she said that she had learned that that was his name. Another witness testified that she was present on another occasion when P. called on defendant. Defendant left her husband, and wrote him a letter, in which she said that she was unhappy; that she had never loved him; that she could keep up the deception no longer; and that he was beginning to notice her coldness. Defendant then went to the house of P.'s sister, with whom P. boarded, but nothing was shown reflecting on the sister's character. An offer by defendant or P. to put themselves in a position to furnish proof on which plaintiff could base an action for divorce, was rejected. A witness testified that he met defendant in another city, when she told him that she left her home with a railroad man. P. was in the employ of a railroad company, but it was shown that he could not have gone with defendant when she left. *Held*, that the evidence was not sufficient to sustain a verdict for plaintiff.

Action by William L. Pfeiffer against Adelia S. Pfeiffer for divorce on the ground of adultery. Two issues submitted to the jury were answered in the affirmative, and defendant moves to set aside the verdict as contrary to the evidence, and for a new trial.

*Arthur W. Hickmann*, for plaintiff.     *Emory P. Close*, for defendant.

HATCH, J.    This action is brought by plaintiff to obtain an absolute divorce from defendant. Issues were framed, and a trial by jury had. The evidence disclosed the fact that the parties were married in 1881, and immediately went to reside at the corner of Elm and Virginia streets, in Buffalo. The co-respondent named in the complaint was one Plato, and under the issues framed two questions were finally submitted to the jury for their decision, both of which were answered in the affirmative. It now becomes necessary to examine the evidence, in order to determine whether it is sufficient to warrant the affirmative findings. The rule of law applicable to this case is not difficult of discovery, it having been quite recently stated by Judge ANDREWS in *Allen* v. *Allen*, 101 N. Y. 658, 5 N. E. Rep. 341, as follows: "We understand the rule to be that in a civil action the fact of adultery may be proved by such facts and circumstances as under the rules of law are legal evidence, admissible in a court of justice, which clearly satisfy the mind of the tribunal which is required to pass upon the question of the commission of the act. In weighing the evidence, and considering the facts and circumstances, great care is necessary, on the one hand, not to be misled, by circumstances reasonably capable of two interpretations, into giving them an evil, rather than an innocent, one; nor, on the other, by refusing to give them their plain and natural significance, on the theory that a different standard of judgment applies to such cases from that which in ordinary transactions guides the conclusions of intelligent and conscientious men." It is seen at a glance that the rule is clear, but, like all similar rules, the great difficulty lies in applying it to the particular facts. By agreement of the parties, and under the decision and charge of the court, the jury were required to answer the two following questions: "*First*. During the months of July and August, 1883, did the defendant commit adultery and have carnal intercourse with a man named Plato, on Elm street, in the city of Buffalo, or elsewhere?" "*Fourth*. Did the defendant, at any time since the marriage with plaintiff, commit adultery or have carnal connection with the said Plato?" The first of these questions was specific, in that it was confined to the particular months; the second, general as to time and place; while both are confined to the commission of the offense with a particular individual, and no attempt was made upon the trial to embrace any other than the individual named.

The evidence offered by plaintiff to establish his allegations consisted of both oral and written, and in all substantial particulars is as follows: Plaintiff first gave evidence tending to establish an intimacy between defendant and Plato prior to the marriage, and called Mrs. Carrie Ginther, a servant who worked with defendant in the house of Mr. Chester, in Buffalo, in 1880, a year prior to the marriage. She testified that upon four or five different oc-

casions Plato called to see defendant, and they went away together; that the house was closed at 10 o'clock P. M.; that defendant was then in, and that she did not know at what hour she returned; that she afterwards conversed with her as to where she went, and was informed by defendant that she and Plato had been out riding, and had drank some; that she drank wine, beer, and pop, and tried to see how much she could drink; that she had been at Schenkleberger's, a saloon. This is all the testimony tending to establish a prior intimacy. The saloon spoken of was a respectable place, and frequented by respectable people. Standing alone, this intimacy does not lead the mind to a clear conclusion of guilt. Indeed, the whole transaction is quite as consistent with innocence as guilt. At the most, we could only say, with reasonable certainty, that the acts were imprudent, but it utterly fails to satisfy the mind of criminality.

We now come to the testimony upon which it is claimed that the jury were authorized to find the criminal act, when taken in connection with the circumstances narrated and others to be named. This rests for support upon the testimony of one witness, Mrs. Childa Meissner, who testified that she lived in the same house with the defendant, at the corner of Elm and Virginia streets, after the marriage; that the defendant kept no servant, but lived there with her husband; that about a month prior to defendant's leaving her husband, which occurred in August, 1883, she saw a man go to the apartments of defendant in the afternoon, and remain about an hour; that plaintiff was not then there, and that she did not know of any other person being there; that about a month after she saw the same man call again, under the same circumstances, and remain about the same length of time. This witness did not know the man's name, and had never seen him before, but she stated, upon her direct examination, that she learned his name was Plato. Her cross-examination was as follows: "*Question.* Who told you what this man's name was? *Answer.* I don't know; most everybody spoke of that. *Q.* After that time? *A.* Yes, sir. *Q.* About how long afterwards was it you heard about Plato? *A.* The next day. *Q.* Did you see a publication in the newspaper that mentioned Mr. Plato's name? *A.* Yes, sir. *Q.* You read about it? *A.* Yes, sir. *Q.* After that you came to the conclusion in some way that the man you saw was Plato? *A.* Yes, sir. *Q.* That is all you know about it? *A.* That is all." She was also unable to describe the man, and his identity was thus left to depend upon a supposition that he was probably identical with Plato. The testimony is claimed by plaintiff to be aided as to identity by the testimony of Mrs. Judd, called by plaintiff. Her statement is that she was present at defendant's house the day before she left her husband, and on that day Plato called, and left a message for defendant from his sister, and she added: "It may have been the same day Mrs. Meissner referred to." Giving full force and effect to all this testimony, it still leaves the mind in doubt as to whether the person seen by Mrs. Meissner to go to the house was the man Plato. Certainly it falls short of clearly satisfying the mind upon that point. But, if we say it was Plato who called upon these two occasions, we are still left in doubt as to what occurred. If one of the occasions was when Mrs. Judd was there, then, upon plaintiff's own showing, it is clear that no criminal act transpired, as she states the purpose of the visit, and what took place. Three circumstances, in connection with some to be hereafter noted, are urged in support of criminal acts at this time between the parties—*First,* the intimacy prior to the marriage; *second,* the absence of the husband at the time of the call; and, *third,* that defendant was alone. We have already adverted to the first. As to the second, it is not an extraordinary occurrence that a former acquaintance calls upon a married lady in the absence of her husband. It all depends upon the situation of the parties and surroundings, the opportunities presented, and the desire, or indication of desire, to commit the criminal act. It may point to a criminal act, and it may

be the most innocent. Here there is not the slightest proof of surrounding circumstances to lead the mind in either direction. It is not absolutely certain that she was alone at any time when Plato called, assuming he did call; as the most that Mrs. Meissner said was that she did not know of any one being present. But it falls short of clear proof, while it is certainly proved that upon one occasion Mrs. Judd was present, which completely refutes any idea of a criminal act at that time.

None of the badges which usually accompany intimacy are here found present. It does not appear that after marriage the parties had ever met, no criminal attachment is shown, no endearments have been witnessed, or intimacy in any particular established; so that, giving this transaction its due weight, it cannot be said from it that the criminal act is clearly established, or that the inference arising therefrom, giving to them their plain and natural significance, leads to a clear conclusion of a criminal guilt. On the contrary, the whole transaction, taken together, is as susceptible of an innocent as a guilty construction, and, when such is the case, courts are bound to adopt the former. *Allen* v. *Allen, supra; Pollock* v. *Pollock*, 71 N. Y. 137.

Another item of evidence relied upon to uphold the verdict is a letter written by defendant to plaintiff at the time she left her home. While this letter is reprehensible to the last degree, and shows an utter disregard upon the defendant's part of the marital obligation, and a faithful fulfillment upon the plaintiff's part, yet I fail to find in it evidence of criminal guilt. Plato's name is not mentioned. The portion of it relied upon is as follows: "Will, I have left you for good. Do nothing rash. Just take things easy, and you will forget me in a little while; at least I hope so, for I am unworthy of your love. I have never loved you as I should do. I tried to do so, and make you happy, but I could not, and am only making you miserable, as well as myself; for I am very unhappy. It is much better that we should part, for I cannot keep up this deception any longer, as you are beginning to notice my coldness towards you. * * * I am not happy with you, although you have done all you could to make me so." While it is quite evident that the plaintiff had been grossly wronged by the defendant, and while a letter of this character, coupled with a willful absence, raises a desire in the mind to sever the marriage relation, so grossly neglected, abused, and disregarded by defendant, yet the court's action must be based upon other considerations, in which sentiment finds no place. I have carefully analyzed this letter, and am unable to find in it evidence of criminal guilt. It says that she is unhappy; that she has never loved her husband, although she has tried to do so, and make him happy; that this deception she can keep up no longer; that he is beginning to notice it, and consequently she leaves. I find nothing more here than that she has practiced deception upon him in pretending to love him when she did not. Certainly there is no strain of language to give it such interpretation. It is in harmony with the whole language used, while to give it a guilty construction we must interpolate something not expressed, and do violence to its whole tenor.

Another item of interest is given by Mr. Schelling, the attorney for the plaintiff at that time, who details finding defendant at the house of Mr. Cullinan after the flight. He states that he conversed with defendant, and charged her with improper intimacy with Plato, which she denied. Mrs. Cullinan was the sister of Plato, but there is nothing shown reflecting upon her character or respectability. She lived in the house with her husband, grandmother, and children; and, some days before, plaintiff had arranged to go to her house when she left her husband. It is true she was Plato's sister, and Plato boarded there; but there is no evidence to show that anything improper took place there, or that Mrs. Cullinan would consent to anything improper, or that there was anything out of place in the whole matter, beyond the fact of her leaving home and going there. Schelling says that he made an ap-

pointment for defendant and Plato to come to his office next day, which they did, and that he then charged both of them with criminal intimacy, and that both denied it; and that Plato said, "You will have to prove that," and then went out of the office to see his lawyer, and afterwards came back. Plato was in the employ of a railroad, and there was some talk that plaintiff would sue him for enticing away his wife, and interfere with his employment; and thereupon defendant or Plato made the proposition that they would put themselves in a position where proof might be obtained upon which to found an action for an absolute divorce. This was communicated to plaintiff, and was by him rejected. The moral degradation of the parties to this proposition is sufficiently evident, and, if it were the law that a willingness to commit the criminal act and an offer to do it were equivalent to the act itself, we should have no difficulty. But nothing was done under it, and, at the most, it only shows that, under certain contingencies, they were willing to put themselves in an equivocal position, but their denials were interposed to the fact of its ever having been done. The only other item of evidence offered by plaintiff was given by Mr. Hornung, who met the defendant in New Orleans, in 1883, where she had gone, and still resides. He there met her in a concert saloon, where she was employed as a waitress. She made herself known to Hornung, and stated to him that she had left Buffalo, and gone to Chicago with a railroad man, and had from the last-named place gone to New Orleans. There is here no admission of criminal guilt on her part. Perhaps the evidence would warrant the inference of criminal guilt, if it established the fact that Plato went with defendant to Chicago when she left Buffalo, as the only issue was her criminal relations with him. If we are to adopt this, we must say that the characterization of employment designates Plato with reasonable certainty, as he was in the employ of the railroad. Railroad men are quite plentiful, and, when this declaration is taken in connection with the testimony, it is far removed from anything like certainty. Mrs. Cullinan was sworn by the defendant, and testified that when defendant left her house for Chicago she accompanied her to the depot, and was the only person who went with her; that she left Buffalo alone, unaccompanied by any one; that Plato was at her house that night and the next evening. This could not be true, and Plato have accompanied her. She further testified that the arrangement by which defendant came to her house was made with her two or three days before she left her husband. This is, in substance, all of the evidence submitted to the jury, with the exception of a subsequent visit, proven to have been made by defendant to Mrs. Judd, and Plato's calling while she was there; but it also appeared in the same connection that Plato was in the habit of calling at Mrs. Judd's, and had been for a long time previous, and that, when defendant left, Plato was not informed, as he then called, and was surprised to find her gone. Taking this testimony in detail, and also as a whole, the most that can be said of it is that much of it is suspicious, and from some of it it is possible to construe criminal guilt, not as a necessary inference, but as a possible one. But it does no violence to ordinary human reasoning to also give it an innocent interpretation; and with the plain rule of construction confronting us, that an innocent rather than an evil interpretation should be placed upon the acts, when they are capable of it, my mind is led to the conclusion that the facts proved do not clearly establish criminal guilt, or authorize it as a fair and clear inference from the testimony. The verdict of the jury will therefore be set aside, and a new trial ordered.