(8 Misc. Rep. 189.)

## WARREN v. WARREN.

(Superior Court of New York City, Equity Term. May, 1894.)

DIVORCE—EVIDENCE.
　　In an action for divorce, the adultery charged is sufficiently proved where it appears that defendant, who was living apart from plaintiff, his wife, occupied a room adjoining the room of one B., whose husband was suing her for a divorce on the ground of adultery with a third person; that defendant and B. had been seen together in night dress; that they had been seen kissing; that B.'s hairpin had been found in defendant's bed; that defendant was surety on B.'s lease; and that B. told her acquaintances that defendant was her brother-in-law.

Action by Minnie C. Warren against Lyman E. Warren for an absolute divorce, on the ground of adultery. Judgment for plaintiff.

Howe & Hummel, for plaintiff.

A. C. Nanz, for defendant.

McADAM, J. In actions for divorce, courts must take such evidence as the nature of the case permits,—circumstantial, direct, or positive,—and bring to bear upon it the experiences and observa-

tion of life, and thus, weighing it with prudence and care, give effect to its just preponderance. Moller v. Moller, 115 N. Y. 466, 22 N. E. 169. The proof in this case is not of a direct, but circumstantial, nature, depending upon a combination of events of such a consistent and reliable character as to form a complete chain of evidence. It appears that the defendant, after separating from his wife, went to board in a flat occupied by the co-respondent, at the "Kingston," No. 100 West Seventy-Sixth street. The co-respondent slept in the parlor, and the defendant in a room adjoining. Mrs. Brewster, the chambermaid, testified to seeing defendant and co-respondent together in neglige attire; to seeing them kiss and embrace one another; to finding in the defendant's bed hairpins and handkerchiefs belonging to the co-respondent, and on one occasion finding her in his room while he was there, both attired in their night dress. It appears that the co-respondent kissed the defendant when he left the house in the morning, and again on his return in the evening, and that she apologized for the proximity of her bed to his by the remark that the defendant was her brother-in-law, and on that account the circumstance was not worthy of comment. The complaint describes the co-respondent as "Lilyou Daniels, otherwise Donna Madixa, otherwise Mrs. Smith, otherwise Mrs. Abbott;" and it appears that she was also known as Mrs. Beardsley. This multiplicity of names is explained by her as follows: "Mrs. Daniels" is the name she acquired from her last husband, William B. Daniels, who sued for and obtained a divorce. "Donna Madixa" is her family and professional name. The name of "Mrs. Smith" is apparently disclaimed. "Mrs. Abbott" is the name she derived from her first husband; and she assumed the name of "Beardsley" because it was that of her mother. It appears, also, that, after the co-respondent gave up the flat at the "Kingston," she took another in West Fifty-Fourth street, on the lease of which the defendant went security, meaning thereby that, if she did not pay the rent, he would. The relations between the parties were equally as friendly at this flat as in the previous one. Indeed, the only division between the bedroom of the defendant and that of the co-respondent was a pair of hanging portieres. The co-respondent called the defendant her brother-in-law, and she was known to the janitress as his sister-in-law. She called his daughter her niece, and that was explained by her in this way: "Mr. Warren's first wife was an Abbott, and Miss Abbott was my husband's cousin, and that is the reason why we assumed any relationship whatever." When asked why she represented the defendant as her brother-in-law, the co-respondent said that "it was to save a great many inquiries into family affairs connected with Abbott and his troubles with his wife, and several other disagreeable things." The explanation may have seemed satisfactory to the co-respondent, but it would be mere assumption to infer that it was at all satisfactory to any one else. It also appears that the defendant took the co-respondent to a theater on at least one occasion, and it is conceded that he kissed her on his leaving for Europe. The co-respondent on one occasion ordered a hat, and had it charged to the defendant,

who paid for it. She first denied this, but the testimony as to the fact was overwhelming. The defendant called several reputable witnesses, who testified that they never saw any acts of familiarity on the part of defendant towards the co-respondent; but their testimony proved nothing, for no one had asserted that these individuals had ever seen anything which might have been a proper subject of comment. The chambermaid is disinterested, and there is no reason to disbelieve her story; and, if that is believed, the case is made out.

It is said that, if the acts of parties are capable of two constructions,—one innocent, and the other not,—the former is to prevail. Pollock v. Pollock, 71 N. Y. 137. This is certainly the rule, but not applicable where a combination of circumstances appears logically pointing to guilt with a potency excluding any other hypothesis. In criminal cases, guilt must be established beyond all reasonable doubt; while all that is required in civil causes is that there shall be a "preponderance of proof,"—a term which means that the plaintiff must produce evidence which carries conviction to the human mind; a process which in its own peculiar manner dispels doubt. The defendant and co-respondent professed their innocence, and, if it should be that they are innocent of wrongdoing, it is unfortunate that they surrounded themselves with circumstances of suspicion evidencing great indiscretion, amounting in legal acceptation to proof of guilt. Defendant was living apart from the plaintiff, his second wife, and the co-respondent was living apart from her second husband. The conduct of either was liable to be criticised, particularly in view of the fact that the co-respondent at this very time was under charges made by her husband in an action for divorce on the ground of adultery with one Rochfort; and the defendant had been divorced from his first wife. It was unfortunate, therefore, that the defendant and the co-respondent came together under such circumstances, in disregard of the admonition "Lead us not into temptation." Even the appearance of evil should have been carefully avoided. The relations existing between the defendant and the co-respondent were evidently more intimate than those of boarding-house keeper and boarder. Why did they assume a false relationship and go to a theater together? Did he not appreciate the peril, or did he defy consequences? The co-respondent admits to smoking cigarettes, and that in the Fifty-Fourth street house nothing but the portieres divided her bedroom from that of the defendant. The defendant and the co-respondent are educated people, with an intelligence that precludes any idea that they were unconscious that their relations were not free from suspicion. Under the circumstances in this case, it is reasonably clear that the defendant is guilty of the charges made. People are to be judged by their acts, which speak louder than words, and often render subsequent explanations unsatisfactory. Let us reverse the order of things and suppose Warren to be the boarding-house keeper, with a suit pending against him by his second wife for divorce on the ground of adultery, and the co-respondent a wife separated from her second husband. Take the fact that she became security for his

rent, went to his house to board, was found kissing and embracing him; that they were in neglige together; that their rooms adjoined one another; that he was seen in her room in sleeping apparel; that his shirt buttons and handkerchiefs were found in her bed; that they assumed a false relationship which required explanation; and it also appeared that she went to a theater with him, and paid for a hat that he had bought and had charged to her. Would any one doubt her guilt? What is the practical difference between the two cases? In worldly affairs the popular view is generally correct, and must be taken if the world is to be expected to agree with you; and, whenever there is a common accord among men upon a given subject, it is nothing less than the judgment thereon of your peers. The plaintiff is entitled to the usual decree, to be settled on notice. Ordered accordingly.