VEEDER B. PAINE v. JOHN FOSTER *et al.*

(Filed Feb. 13, 1896.)

Dissenting opinion by

McATEE, J.: While differing from the majority of the court in my views of the law which direct the final determination of this case, I yet agree with an exception

with my associates upon the legal propositions laid down in eight of the ten heads comprising the syllabus of the opinion which has been adopted, in part, as the opinion of this court. The exception referred to is upon the proposition, that conclusions and inferences from facts, made by the secretary of the interior, are final and binding upon courts. The question of parties as treated in the original opinion was not passed upon by the court, and will be noticed briefly herein.

As has been suggested, the majority of the judges sitting at the first hearing did not control the opinion, by reason of the clause in the act of congress, which requires that three judges must concur to reverse the lower court. Having twice listened to a full presentation of the case by oral argument, carefuly studied the briefs, examined the record evidence, and analyzed the cases cited by both parties as authorities, I am convinced that my view of the law which should and does govern the case, is in harmony with the decisions of the supreme court of the United States upon the principle involved, and I am forced to conclude that in passing upon this case, the real question at issue has been overlooked. The voluminous records, the long delays, the several changes in the personnel of the court, the multiplicity of questions raised by counsel, may have tended to divert attention from the propositions of law which I regard as the essence of the case, and those upon which it should have been determined.

They may be briefly stated, as follows:

First. The conclusions and inferences made by a secretary of the interior from the facts found in a con-

tested claim to a tract of public land, do not preclude a court of equity from reviewing and correcting the same, when in the opinion of the court, there has been a misapplication of the law to the facts which results in giving to one man the land which upon the undisputed facts should go, under the law, to another.

Second. Where all the facts found by the land department of the interior are, in a proper action, presented to a court of equity, it may take the facts so found, and apply the law to the facts, in its own way.

It was said in *Johnson v. Towsley*, 13 Wall. 64, that: "We are not prepared to conclude that when in the application of the facts as found by them, they, by misconstruction of the law, take from a party that to which he has acquired a legal right under the sanction of the laws, the courts are without power to give any relief."

And it was said in *Shepley v. Cowan*, 91 U. S. 330: "The officers of the land department are specially designated by law to pass upon proofs presented with respect to settlement upon the public lands. If they err in the construction of the law applicable to any case, their rulings may be reviewed and corrected by the courts when a controversy arises between parties, founded upon their decisions."

And in *Moore v. Robbins*, 96 U. S. 530, that: "As to facts upon which their decision is based, that decision is conclusive, even in courts of justice, when the title afterwards comes in question, but that, in this class of cases, as in all others, there exists in courts of equity the jurisdiction to correct mistakes, to relieve against frauds and impositions, and, in cases where it

is clear that those officers have by a mistake of the law, given to one man the land which upon the undisputed facts belonged to another, to give appropriate relief."

And in *Marquiz v. Frisbie*, 101 U. S. 473, that: "If it can be made entirely plain to a court of equity that upon facts about which there is no dispute, or no reasonable doubt, those officers have by a mistake of the law, deprived a man of his rights, it will give relief."

And in *Baldwin v. Stark*, 107 U. S. 463: "Where the latter (the officers) have clearly mistaken the law of the case as applicable to the facts, equity may give relief."

And in *Bohall v. Dillo*, 114 U. S. 47, that: "In consequence of erroneous rulings of the officers of the land department upon the law applicable to the facts found, the right of the settler was denied him."

The case of *Lee v. Johnson*, 116 U. S. 48, was a case where the settlement was admitted to have been made for the benefit of another, contrary to the statutes, and upon this question as to whether residence had been sufficiently personal and continuous to preserve his right, if in fact, he had initiated any, and whether or not he had abandoned the land: "The finding of the secretary upon any of these matters of fact cognizable by it, has been expressly affirmed.   *   *   If, however, these officers mistake the law applicable to the facts, or misconstrue statutes, and issue a patent to one not entitled to it, the party wronged can resort to a court of equity to correct the mistake, and compel the transfer of the legal title to him as the true owner."

In the opinions handed down in this case, no mention is made of this power of the court, and the argument,

reasoning and citations have been made solely with a view to uphold the conclusiveness of findings of fact made by the secretary of the interior, and I find that in each case the facts in dispute were upon the questions of the settlement and improvement, and the facts about which cluster the only legitimate test of good faith. And this proposition has been made prominent in the opinions, to the exclusion of any consideration of the main and only contention of the plaintiff in error.

In his petition it is alleged that the conclusions and inferences made by the secretary of the interior are warranted neither by the evidence nor by the facts found; that some, findings are unsupported by any evidence; and that, admitting all the facts as found to be the facts proven, they do not, under the law properly applied, support the conclusion reached by the secretary, nor warrant the "theory" upon which it is based.

In *Quinby v. Conlan*, 104 U. S. 420, it is said, that: "The laws of the United States prescribe with particularity the manner in which portions of the public domay be acquired by settlers. * * They require personal settlement upon the lands desired, and their inhabitation and improvement, and a declaration of the settler's acts and purposes to be made at the proper office in the district within a limited time. * * By them a land department has been created to supervise all the various steps. They are required to receive, consider and pass upon proofs furnished as to the alleged settlements upon the land and their improvement. For mere errors of judgment, as to the weight of evidence on these subjects, the only remedy is by appeal to the superior of the department. It is only when those offi-

cers have misconstrued the law applicable to the case as established before the department, that the courts can, in a proper proceeding, interfere and refuse to give effect to the action."

Applying this rule to the case under consideration, it is to be observed that, after weighing the evidence on these subjects, as well as upon the subjects pertaining to homesteads in Oklahoma, the "superior of the department" found as a fact, that all the requirements mentioned in *Quinby v. Conlan, supra,* were complied with by plaintiff in error in settling on the land claimed by him, and this court should have decided this question: Do the facts, as established before the department, entitle plaintiff to the relief he seeks?

"A finding of fact by the land department that a homestead entryman has complied with the requirements of the law as to settlement and improvement is conclusive upon the courts." (*N. Pac. R. Co. v. McCormick,* 89 Fed. 689.)

It is, then, the law that the findings of fact upon the weight of disputed evidence are final. What facts were found in the present case? The record before the court shows the facts found by the commissioner of the general land office, in these words: "Veeder B. Paine, (the plaintiff in error,) was a qualified entryman and entered Oklahoma in a proper maner; made his selection in advance of the townsite claimants; performed all the acts of settlement possible under the circumstances; erected a home as soon as he could; improved and cultivated the land as far as practicable; offered his filing at the proper land office within the prescribed time, and has continued to live on his claim;" and concludes that: "His good faith is placed beyond controversy."

Since the "superior of the department" accepted these facts, did not reverse or change any of them, they are the undisputed facts, and the facts found to which the law must be applied.

Ignoring these facts, which compel a conclusion of good faith, the secretary proceeds to make inferences not in evidence, in the following manner:

"Every intelligent person is aware of the fact that for the last half century the establishment of a United States government land office was equivalent to the foundation of a town of greater or less magnitude; where-ever a spot was selected for a land office that spot became the center of population, it became a town, and the land ceased to be in a condition where it could be used for purposes of agriculture. Of all the thousands of eager, active and intelligent men who had collected on the borders of Oklahoma prior to 12 o'clock, noon, on April 22, 1889, there was hardly one who was ignorant of the fact that a government land office had been established at Guthrie, and of the resulting fact that a town would be established there, and already predictions of its future greatness as the capital of the Territory, had been indulged in. The waiting crowds knew all the facts, and they knew that the land in controversy must be used for the homes, the business and the trade of the people who would compose the population of this coming town. * * Taking the whole history of this case into consideration, I am unable to arrive at the conclusion that Paine, either in the conception or execution of his settlement on this land, acted in good faith, as a *bona fide* claimant under the homestead law, and in the absence of good faith no claim can be recognized. All the facts indicate that the claim was taken for speculative purposes only, to enable him to dispose of this land for townsite purposes, and that it was not taken for agricultural purposes, and for the

purpose of a home, or at least for a home as contemplated by the homestead law."

And concludes:    "The claim of Paine must be rejected on the theory that he seeks to make this entry for speculative purposes, makes it in order that he may sell it to townsite occupants on account of its being occupied for purposes of trade and commerce."

At the hearing in the land office, it was sought to disqualify the homestead claimant on account of a supposed relay of horses placed along the route, and this, if established as a fact, would have disposed of the case. The undisputed evidence and the several decisions in the land department show that after riding about eight miles and when nearing the land in dispute, and well in advance of all those who left the line with him, none of whom were townsite seekers, he overtook a friend, one Jerome, of Michigan, who was on his way to take the south bound train at Guthrie station, which he did that same day. Upon riding up to him, Jerome noticed that the saddle girth was broken, and suggested to Paine that he ride his horse the short distance remaining. Paine did so, and Jerome, after fixing the saddle, rode into the station and over the claim in controversy, before any townsite settlers had come upon the land in dispute; the trail from the east to Guthrie station passing across this land.    Concerning this incident, resulting from an unforeseen accident, the secretary does not find any prearrangement, and holds against the homestead claimant on the adjoining quarter section, who met with no accident on his ride over the same route, as follows:

"The remarks applicable to Paine, apply with equal force to Fitzgerald in the consideration of his claim to

the northwest quarter of section 8.   While the incidents connected with the trip of Paine did not take place in the trip of Fitzgerald, yet he possessed the same knowledge that the tract claimed by him would be used at once for townsite purposes."

The secretary also ruled that Paine, notwithstanding this incident, and others of which he speaks, might have lawfully settled upon the other lands over which he passed, and that he might successfully have held parcels of the quarter section in dispute "in common with other lot claimants."   This he might not do if in any manner disqualified, by disobedience of the law and the proclamation of the president.

The commissioner having held Paine qualified to take the entire quarter section as a homestead, and the secretary having agreed that he might lawfully lay claim to a part, it appears that the theory of speculation attaches to this transaction only because of the fact, that soon after the homestead settler's rights attached, a considerable number of persons determined to go upon it, and divide it into lots and blocks. · To other tracts adjoining the 320 acres, known as Guthrie proper, on the north and south, where no persistent  townsite  settlements were made, the theory of speculation did not attach, and homestead entry was permitted, although, if the secretary's reasoning is sound, and his conclusions are valid, these lands, being equally near to the government land office, equally "in the eyes of every intelligent person, became the center of population, it became a town, and the land ceased to be in a condition where it could be used for purposes of agriculture."

It cannot be denied that the secretary misapplied the law to facts in holding, as he did, that "the official acts

of the president had given notice to all the world of the fact, that the lands, (referring to the half section adjoining Guthrie proper on the east,) would be used for purposes other than agriculture," "that Paine knew this," "that he started for this townsite." It was only by treating this land as a townsite, and not open to homestead settlement, that the prior homestead settler could be cut off, and to this ruling, that it was reserved by the acts of the president for townsite purposes, was attached the speculative theory. This was error of law, subject to review, and should have been reviewed and reversed by this court.

"Whether lands are within the limits, or subject to a grant for public improvements, is not a question of fact, within the rule that the judgment of the land department is final on the facts." (*U. S. v. Coos Bay Wagon Co.*, 89 Fed. 151.)

Whether the land involved in this case was or was not within the limits reserved for townsite purposes, is then, a question of law. This land was not a townsite. The president had given no such notice by any official act or otherwise. On the contrary, it could not be used legally as a townsite, and the president and the acts of congress invited settlement thereon. The 320-acre limitation to townsites, should have controlled the disposition of this case in the interior department, and, failing there, this court should not have neglected to pass upon this vitally fundamental proposition which, although urged in brief and oral argument, has thus far not been treated of or met in the opinion of the court.

Under the act of congress of March 2, 1889, it is very clear that no more than 320 acres of land could be en-

tered for townsite purposes at any one place. The interpretation of the act by the interior department, as promulgated by circular letter of instructions sent to registers and receivers before the opening, printed in 8 L. D. page 336, is as follows:

"Only 320 acres, one-half section of land, can be taken at one point, no matter what the number of inhabitants."

The petition alleges, the record shows and the demurrer admits, that Guthrie, the east half of section 8, was the 320 acres first selected and occupied as a townsite. By its selection and occupation, the maximum legal area limit was exhausted at this point, and all the rest of the public lands included in the proclamation of the president, including the quarter sections of land adjoining the 320 acres reserved for townsite purposes and including the quarter section claimed by the plaintiff [were open to homestead entry]. Immediately adjoining the townsite of Guthrie was the west half of section 9, which had been segregated from the public domain by acts of settlement, personal occupation and presence of qualified homesteaders, before any townsite seekers went upon it in pursuance of a plan to evade and circumvent the law of congress, by establishing so-called separate towns. That those who took forcible possession of the two homestead claims on the west half of section 9 were promoters of an unlawful scheme, by unlawful means and force, is shown by the record, and by the finding of fact by the secretary, as follows:

"The application filed April 26, 1889, by T. H. Soward, mayor, et al., to enter the west half of section 9, as the townsite of East Guthrie, having been made in the interest of men, many of whom entered the Territory prior

to the time fixed by the proclamation of the president, in violation of the act opening the same, it must be rejected."

By reason of the filing of the application referred to, which was prior to the application of the homestead claimant only because it was taken into the land office through the mail, while the settler was forced to stand in line awaiting his turn, the homestead claimant's application to enter was rejected, and wrongfully rejected by the local land office, the townsite application having been received in violation of the instructions of the secretary.

The questions which were ordered to be inquired into at the hearing before the register and receiver, under the limitation clause of the act of congress, were (1) priority of settlement, (2) the qualifications of the homestead claimants to take land in Oklahoma, and (3) the status of the Guthrie townsite applications.

In his letter ordering the hearing, the commissioner of the land office said, that:

"I am inclined to believe that these applications include different portions of one and the same town. You will issue notice in accordance herewith, and require it to be served upon the adverse claimants to these two sections of land, the burden of proof being upon the former to show the alleged facts reserving the lands from disposal as homesteads."

As to the land claimed by plaintiff in error, such reservation was not shown. The only reservation is found in the erroneous conclusion of the secretary, that the acts of the president had "reserved" it for a townsite, by locating a government land office in the next

section.  It is my belief that every quarter section of
land adjoining the half section which was alone "re-
served" for townsite purposes, and the whole of the re-
mainder of the public lands then opened, were, by the
act of congress, open to settlement by homesteaders,
and for homestead purposes only.  Other acts provide
for changing a homestead entry to a towsite entry, by
the claimant, when found necessary or advisable, upon
the payment to the government of $10 per acre.  There
was, therefore, no need for the effort to appropriate
land dedicated to homestead entry alone, for settle-
ment and appropriation as a townsite, without authority
of law.  Congress invited homeseekers to settle upon
these lands lying adjacent to the half sections reserved
for townsites.  In accepting this invitation, they had a
right to presume that the law would protect them in
such settlement, and would prevent townsite claimants
from encroaching upon their homesteads.  I do not be-
lieve the proposition will ultimately be upheld, which
attributes to the acceptance of such an offer a bad
motive, or an unlawful or fraudulent intent; and, when
as in this case, the theoretical conclusions and improper
inferences from proper facts inflict a penalty in the
nature of a confiscation of property rights, for doing
an act which the law invites, a court of equity ought
not to permit such a conclusion to stand.

It is found as a fact by the secretary, and conceded
in the opinion of this court, that the homestead claim-
ant, plaintiff in error, settled upon the land in contro-
versy before any settlement was made thereon by town-
site settlers.  His taking the land solely for his own
use and benefit; his continuous residence; his applica-

tion to enter within the time prescribed; his declaration, made under oath, of his intent to take the land as a homestead; his qualifications to take land in Oklahoma, under the provision of the homestead law applicable thereto; his right to have applied to his acts of settlement, and to his subsequent acts of residence and improvement, the same tests of good faith common to other homestead claimants; all these are conceded. No pretense is made that any person other than himself was interested in the land, nor that any contract existed whereby any person might afterward lay claim to an interest therein, nor of any offer to sell or trade or dispose in any manner of any portion of the land to any person, yet, in support of his theory, the secretary says, without a particle of evidence to support it, in his opinion, 12 L. D. 658, that:

"All the facts indicate that the claim was taken for speculative purposes only, to enable him to dispose of this land for townsite purposes, and that it was not taken for agricultural purposes, and for the purpose of a home, or, at least, for a home as contemplated by the homestead law. The claim of Paine must be rejected on the theory that he seeks to make this entry for speculative purposes." * *

The departmental record evidence, with the different decisions in the case, having been properly presented to this court, we are possessed of all the evidence, and all the facts found, and after a careful study of these, I am constrained to say that I discover no facts, found by the secretary of the interior, which indicate bad faith, or any speculative or fraudulent intent on the part of the homestead claimant, the plaintiff in error, nor any fact or finding of fact which, with the law properly ap-

plied thereto, do not compel the conclusion that the land was "taken for the purpose of a home, such as is contemplated by the homestead law." I quite agree with the majority of this court in their ruling: "That if there is no dispute, or no reasonable doubt, as to the allegations in plaintiff's complaint, that there was no testimony whatever, or any evidence from which it could be reasonably inferred, that Paine did not, as found by the secretary of the interior, take the land for homestead purposes, but for speculative purposes, a court of equity could and should grant him relief." But, in the recital of the evidence indulged in by the court, which follows closely the secretary's language, there develops no evidence, "however slight," tend ing to show a fraudulent intent, or any unlaw-ful purpose; nor any fact from which any legiti-mate inference can be made, or any reasonable doubt raised, or that gives rise to a suspicion that the claim was taken for any other purpose than is set forth in the settler's application to enter the land.

Failing to discover any evidence tending to a legiti-mate support of the theory of the secretary, or tending to cast a suspicion upon the intent, and much less lead-ing to a necessary or legitimate inference of fraud, this court should, upon its declared view of the law, hold in accordance with its own convictions of the law appli-cable to the facts, and in harmony with the equities of the case. It was plainly a misconstruction of the law to hold that this land was reserved in effect from home-stead settlement, for any reason. It was an erroneous conclusion, and one not to be followed, that the west half of section 9 "was a townsite," for which any one

"could start," before any townsite settlers had even set up a claim thereto. Into this last mistake the secretary may have been led, by misapplying the law of May 14, 1890, to conditions arising under the act of March 2, 1889, this case being still under consideration in the department when the act of May 14, 1890, became the law. These errors under which this case was disposed of in the land office, should not be adopted or perpetuated as a part of the law of the land.

We are asked to apply the law to the facts. A court of equity has this power. It is conceded by my associates that, from the evidence, they would have reached a different conclusion, and there is no room for doubt, that to the facts found a different application of the law ought to have been made in the interior department.

It has been suggested that this case seems to be without a parallel, and I hold that it is one which calls for the exercise of that high prerogative of equity, so jealously preserved by the supreme court of the United States, in cases involving the acts of the interior department in the disposition of the public lands.

In *Johnson v. Towsey*, it was held, that:

"There has always existed in courts of equity, the power, in certain classes of cases, to inquire into and correct injustice and wrong in both judicial and executive action, * * no reason is perceived why the action of the land office should constitute an exception to this practice. * * And so, if for any reason, recognized by courts of equity as a ground for interference in such cases, the legal title has passed from the United States to one party, when in equity and good conscience, and by the laws which congress has made on the subject, it ought to have gone to another, a court of equity

will convert him into a trustee of the true owner and compel him to convey the legal title."

I agree with the view, that when the entire record made in the land department is made a part of the complaint, the court may examine the evidence for the purpose of determining whether there is evidence to support the material findings of fact, but I see no reason for such examination if we decline to exercise the power to draw our own conclusions and inferences from the evidence, and thus determine judicially whether there was any testimony or any evidence from which "it could reasonably be inferred that Paine did not take the land as an actual *bona fide* homestead settler, and for a home as contemplated by the homestead law."

In *Smelting Co. v. Kemp*, 104 U. S. 636, it is held, that: "If in issuing a patent, its officers took mistaken views of the law, or drew erroneous conclusions from the evidence, or acted from imperfect views of his duty, or even from corrupt motives, a court of law can afford no remedy to the party alleging that he is hereby aggrieved. He must resort to a court of equity for relief."

And in *Irwin v. Marshall*, 20 How. 567, it is said, that: "Of the practice or the opinion of the officers of the land department, no evidence is exhibited upon this record. But, supposing this to be in accordance with the above suggestion, they could by no means, control the action or the opinion of this court in expounding the law with reference to the rights of litigants before them; and this they must do in accordance with their own convictions, uninfluenced by the opinions of any and every other department of the government."

However desirous the courts may be to sustain the interior department when the ends of justice may thus be served, they have ever carefully preserved the right to inquire into the proceedings of special tribunals, making no exception of the land department.

Thus, while it is true that congress has clothed the secretary of the interior with vast authority in the administration of the public business, yet his power is not absolute, nor above the law, and may not be exercised unjustly or arbitrarily. It is not needed to review the evidence in this case. The decision of the secretary, with its findings and conclusions, shows within itself that, to say the least, he acted upon inferences, instead of upon facts, and, as heretofore stated, the opinion of the court conceded that: "From the record, it seems clear that Paine settled on the land in controversy before any settlement was made by the townsite settlers, and, if this case were submitted to us on the evidence introduced · before the land department, our conclusion as to the facts would probably be different from the findings of fact of the secretary of the interior."

And I entertain no doubt that they, with myself, are unable to understand why the conclusion was adverse to Paine, and that they are satisfied that an injustice has been done him, and that, in all equity and good conscience, he was entitled to patent to the land in question.

The failure in this case to distinguish between findings of act and inferences from the facts, has resulted in confusion. A court should not accept a "theory," or an inference made from the facts, by any

special tribunal, in lieu of facts themselves, and the language of the secretary that: "All the facts indicate;" "I am unable to arrive at a conclusion;" "the claim must be rejected on the theory;" "I cannot assent to the doctrine," are not findings of fact, but are mere argumentative inferences, and are a mistaken application of the spirit and letter of the homestead law to the facts, and that they should be treated as such, I am supported by the ruling of the court in its definition of the thirty-first finding in the case of *The Brittania*, 153 U. S. 141, in which the supreme court of the United States, by Mr. Justice Shiras, said:

"It cannot be reasonably held that the thirty-first finding was a finding obligatory on the court. It is in these words: 'The conduct of those in charge of the Beaconsfield, as specifically set forth in the foregoing finding, does not warrant the inference that there was on their part negligence contributory to produce the collision.' Of course if this were a finding of fact, within the meaning of the rule, it would be conclusive of the case, and all the other findings would be mere surplusage. But it is evident that the learned judge did not intend it to be so regarded. It was plainly meant as additional conclusion in law. He speaks of it as an 'inference from the foregoing findings.' Nor can we assent to the proposition that it is competent for the judge, who is to find the facts for this court, to shut us off from a consideration of the legal effect of the other facts found, by a conclusive finding that, in his opinion, a particular inference is or is not warranted by the facts so found. Regarding, therefore, this finding as merely expressive of the learned judge's view of the legal conclusion that arose upon the facts as found, and, giving reasonable effect to his findings of fact, we are unable to concur in his conclusion."

It is my opinion that the conclusion reached by the secretary, in effect that the conduct of Paine as specifically set forth in the foregoing findings of fact, warranted the inference that: "There was on his part a fraudulent intent to take land under the guise of a homestead and then sell it out to lot claimants at his own price," is not a finding of fact within the meaning of the rule, but is an inference from the facts, and does not shut us off from a consideration of the legal effect of the facts found.

The theory of speculation, complained of by plaintiff in error, seems to have been associated in this case, both by the secretary of the interior and by the court, with the terms "bad faith," so often mentioned in the decisions of the land department; whereas, the desire to better his condition, which prompts every homeseeker to settle upon the tract of land in his judgment most desirable, and most likely to become valuable, is not akin to the question of good or bad faith.

Actual settlement, continuous residence, cultivation and non-alienation,—these facts were found in his favor, and the necessary conclusion, under the land law, was good faith. The principle is well stated in an early land decision by Lamar, secretary of the interior, afterwards on the supreme bench, in the case of *Maria Good*, reported in 5 L. D., that:

"The original homestead act of May 20, 1862, was entitled, 'An Act to Secure Homesteads to Actual Settlers on the Public Domain.' That act which is substantially embodied in the Revised Statutes, sec. 2289, *et seq.*, prescribed certain pre-requisite qualifications which must exist in settlers under the law. If found

to exist, then what? Actual continuous residence and cultivation must follow, and proof may be made that no part has been alienated. * * From the foregoing it seems clear that when once legal qualification to make homestead entry is established, and the land applied for is subject to such entry, then the only remaining questions for the land department to consider are those relative to residence, cultivation and alienation. * * It only remained for her to show compliance with positive requirements of the homestead law, which are conditions subsequent, in order to entitle her to a full legal title by patent."

The same secretary, reversing the commissioner, in 4 L. D. 287, said that: "It further appears from said proof that his residence and occupancy had been continuous, and that his family was with him on the land. On these facts he claims that he is entitled to a patent, under the law, and that your decision to the contrary is error. * *. We have already seen that when appellant applied to commute, he proved an actual residence for six months—no bad faith can, therefore, be imputed."

The only test of good faith, as contemplated by the act of congress, was established by Secretary Teller, in *Higgins v. Wells*, 3 L. D. 22:

"The homestead law is a practical law, and is so devised that it may have a practical enforcement. The law itself provides its own evidences of good faith, in improvements, cultivation and residence; if these exist as facts, the law is satisfied. If the things done on the land are sufficient to warrant good faith, we must infer good faith; and we may not go off the land and find a fact elsewhere from which we may infer bad faith."

It is apparent that this rule was not followed in the present case; and that the secretary of the interior, in this case, went "off the land," and found a fact elsewhere from which he inferred bad faith and built a conclusion upon "theory" and inference.

By the term, *"bona fide* settler," is meant an actual settler. Upon this question of good faith, the rule, as laid down by Teller and Lamar, *supra*, is the rule by which the good faith and intent of plaintiff in error must be tested. Its misapplication produced a result as unjust, and so manifestly against what the settler's acts and his oath show that he intended, as to force a conviction that there was a miscarriage of the law.

In *Germania Iron Co. v. James*, 89 Fed. 871, it is held, that:

"An application to enter land gives a vested right thereto. It is essential to the just and impartial exercise of the powers conferred upon the land department in disposing of the public lands, that it should adopt and steadily maintain rules and regulations governing the practice of making entries, and such rules when promulgated become a law of property, and cannot be ignored by the department to the subversion of rights acquired in accordance with their requirements."

In support of this view, I rely with confidence upon the opinion of the court as stated by Mr .Justice Brewer in *Ard v. Brandon*, 156 U. S. 537, that:

"In all such cases, the first in time in the commencement of proceedings for the acquirement of the title, when the same is regularly followed up, is deemed to be the first in right, within the authority of that case, citing *Shepley v. Cowan*, 91 U. S. 330.   We think the de-

fendant has shown an equity prior to all the claims of the railroad company; he pursued the course of procedure prescribed by the statute; he made a formal application for the entry, and tendered the requisite fees, and the application and the fees were rejected by the officer charged with the duty of receiving them, and wrongfully rejected by him. Such wrongful rejection did not operate to deprive the defendant of his equitable rights, —the law deals tenderly with one who in good faith goes upon the public land with a view of making a home thereon.    If he does all that the statute prescribes as the condition of acquiring rights, the law protects him in those rights. There can be no question of the good faith of the defendant. He went upon the land with a view of making it his home. He has occupied it ever since. He did all that was in his power in the first instance to secure the land as his homestead. That he failed was not his fault."

In *Duluth & Iron Range R. R. Co. v. Roy*, 173 U. S. 587, the case of *Ard v. Brandon, supra*, is cited and approved.

The theory adopted in the present case, upon which the settler was deprived of his rights, is a theory of fraudulent intent to secure a parcel of government land with some unlawful design to, in some manner not pointed out, defraud the United States to its injury, in that, in parting with this quarter section of land, it should confer title to a homestead claimant, instead of disposing thereof at the same price per acre, if commuted, to a townsite claimant. The process of reasoning this plan to dispose of the homestead claimant was reaced by "theory" and inference, alone.    There being no evidence, nor any fact or circumstance tending to contradict the affidavit required to be made by a homestead claimant, the rule applies to this case as laid down

in *Morris v. Talcott*, 96 N. Y. 100: "Where there is no evidence legitimately tending to establish such a conclusion, and the natural inference to be drawn from the facts proved do not necessarily lead to the presumption of a fraudulent intent, a question of law is presented for the judgment of the court."

Fraudulent intent has been presumed, not from anything the plaintiff is claimed to have done, but for something the secretary thought he might do, and owing to a secret purpose, imangined by the secretary to have a lodgement in the mind of this homestead settler, whereby he might, after, if he should acquire a right to do so, dispose of the land to a considerable pecuniary advantage, in excess of the value of some other lands upon which he might have settled between the point from which he started and the spot where he located.

In Bump on Fraudulent Conveyances, page 189, it is said: "The law can take no cognizance of feelings and intentions which are not manifested by external conduct. It cannot assign a bad motive to an act which is not wrong either in itself or in its necessary consequences. When the act is right, no secret feeling can change its character. In contemplation of the law, the motive which results in proper action is not a bad one." (Citing *Bunn v. Ahl*, 21 Penn. 387.)

The record shows that the land in dispute lies on a fine creek, has considerable bottom land, is all tillable, well adapted to crop raising, and above the average quarter section of land in Oklahoma.

In *Cooper v. Harris*, Copp's Land Laws 730, it is said: "As a pre-emptor he has an unqualified right to make

the location of the claim with reference to the probable development of the country, and if that resulted in securing a tract adjoining a town, it would in no matter reflect upon his good faith toward the government, so long as he complied with the letter and spirit of the pre-emption law. When Harris went upon the land, it was entirely vacant and unoccupied."

In *Plummer v. Jackson, Ibid*: "A pre-emptor is not forbidden to settle upon lands that are likely to become centers of population, or near a town or village,  *  * even though he believes that his claim would become of great value on account of the proximity of villages, or cities, or that villages or cities would even be built upon such claim, and thereby enable him ultimately to realize large prices for such land. That is not the kind of speculation the statute was intended to prevent."

In *Bennett v. Cravens*, 12 L. D. 651, the rule is laid down as follows:  "A settler's right to public land cannot be denied on suspicion;  *  * as an intelligent man he could not fail to be convinced that land immediately adjoining a growing town would soon become valuable, and there is nothing more reasonable than that he should strive to secure that land for his own benefit."

These cases state the law which should have been applied to the facts in this case, and they leave the theory of speculation in the nature of a *reductio ad absurdum*.

In the case of the *United States v. The Brig Burdette*, 9 Pet. 682, the rule is stated as follows:  "And if a fair construction of the acts and declarations of an individual do not convict him of an offense; if the facts

may all be admitted as proved, and the accused be innocent, should he be held guilty of an act which subjects him to a forfeiture of the property on mere presumption? He may be guilty, but he may be innocent. * * No individual should be punished for a violation of law which inflicts a forfeiture of property, unless the offense shall be established beyond a reasonable doubt. This is the rule which governs a jury in all criminal prosecutions, and the rule is no less proper for the government of the court when exercising a maritime jurisdiction."

The rule here repeatedly reiterated applies to this case.

In *Pollock v. Pollock*, 71 N. Y. 137, it is held, and correctly, as I believe, that: "It is error of law to find a material fact with no evidence to support it."

It must be conceded that there is no evidence to be found in this record; no circumstances noted by this court, nor any fact found by the secretary, tending to show, except upon "theory" and inference, any degree of fraud, and it is my belief that in this case, such a question of law is presented, that we may, and should, take such facts found as are sustained by evidence, and apply the law to these facts, independently of the conclusions and inferences made from the same facts in the interior department.

Homesteaders and towsite settlers are equal before the law. *"Qui prior est tempore, potior est jure,"* has long been the established rule of the land department in determining individual rights to public lands, and it is wisely left to govern in the settlement of Oklahoma. Settlement upon the public land under this law, segre-

gated it *"eo instanter"* from the public domain, and the settler, either homestead or townsite, who followed the subsequent steps required by law, acquired by such settlement rights which would finally ripen into fee simple title.

Since, in my opinion, the quarter section of land on which the government had reserved an acre for land office purposes, was open to any homestead claimant until segregated under the law, by townsite settlement, I am at a loss to understand how any acts of the president had withdrawn from homestead settlement land in an adjoining section, or why settlement thereon for homestead purposes should be denied to the prior settler, because, as is stated, "it was a townsite."

In adopting his theory, which I am confident is without precedent, the secretary of the interior may unconsciously have permitted his decision to be influenced by appeals similar to those urged in this court.

The secretary says: "The land in controversy is now covered with lasting and valuable improvements, worth many thousands of dollars, and is occupied by an intelligent and thriving community, which located there in part within a few minutes after the arrival of Messrs. Paine and Fitzgerald; and to my mind, it would be a very harsh, unjust and inequitable ruling to hold that because they reached this townsite first, if they did, that they own it," thus taking the land away from the first settler, a homestead claimant, and giving it to townsite settlers who came upon the land later, and in disregard of the notice of the homesteader's claim and against his protest, and in furtherance of a pre-arranged plan to evade the provisions of the statute.

It has been well said that: "Courts are sometimes led into absurdities be elevating a mere incident into the place of its principal," and in this case, we should not sanction the substitution of the incidental reaching out of a townsite scheme in the direction of this land, for the main and principal facts which control the rights of the parties.

Upon the questions raised in the pleadings relating to the jurisdiction of the court over the subject matter, and upon the defect of parties, the opinion of my associates is left in doubt, since, in adopting as the opinion of the court the views of Mr. Justice Burford, as they are expressed in *Paine v. Foster*, this volume, p. 213, they make an exception of his ruling upon the question of parties, and without passing upon it.

I feel called upon to state briefly my personal views, since, if this court has had no jurisdiction and the right parties are not in court, I see no occasion for having assumed jurisdiction and holding for so many years this case, and finally passing upon its merits.

The demurrer to the complaint filed by the plaintiff in the district court, states five separate grounds. First, that the court has no jurisdiction of the defendants; second, no jurisdiction of the subject matter; third, defect of parties; fourth, that complaint does not state facts sufficient to constitute a cause of action; fifth, that several causes of action are improperly joined.

This suit was begun after patent issued to the townsite trustees, and before title to any lot had been conveyed by deed from the trustees. A proper notice *lis pendens* was filed with the suit.

It seems to me that the rules of practice in suits against the trustees of an express trust, to .defeat the trust, should apply here.     At the time this suit was brought, the beneficiaries of the trust were unknown. The trustees alone had the power to identify them, and they had not done so. It was not possible to name them individually as defendants, and it was not necessary. They could, at any time after they received title from the trustees, have asked to be made parties, and have in fact been at all times represented by counsel, and have directed the course of the defense.

This case is within the exception to the rule, that:   "In suits of equity in reference to a trust estate, the trustee and the *cestui que trust* are both to be joined."

The rule and the exception are laid down in *Vetterlein v. Barnes*, 124 U. S. 169, where it is said, that:   "But the rule is different where the claim of plaintiff antedates the creation of the trust and the suit is brought, not in recognition or furtherance of the trust, but in hostility to it."

The Statutes of Oklahoma, section 3767, also provid-s: "Except as herein otherwise   provided, every express trust in real property, vaild as such at its creation, vests the whole estate in the trustee subject only to the execution of the trust, and the beneficiaries take no estate or interest in the property but may enforce the trust."

There was, then, no defect of parties here.

In discussing the question of jurisdiction of the subject matter, such jurisdiction by this court is strenuously denied by defendants in error on the authority, princi-

pally, of the ruling of the supreme court of the United States in *McDaid v. The Territory,* 150 U. S. 209. In that case the court used this language:

"By the scheme of this act, the title is held in trust for the occupying claimants it is true, but also in trust *sub modo* for the government until the rightful claimants and the undisposed of, or surplus lands are ascertained. The act did not contemplate that the allowance of the entry and the issue of the patent should operate to devolve the final determination of conflicting claims to lots upon these government appointees, and, until the trustees conveyed, the title did not pass beyond the control of the executive department in that regard."

I do not beileve that, by this language, the court intends that the legal patent had not passed the legal title to the trustees. The meaning is clear. The title in its transmission passed out of the government, and into the hands of the trustees, where it remained until the claimants to lots, the *cestui que trust,* had been identified. Until such determination was complete, the direction of the title as between conflicting claimants to lots was under the control of the secretary of the interior, acting with appellate and supervisory powers. When no conflict arose over a lot or lots, the trustees conveyed an absolute title, without the knowledge or consent of the secretary. The conveyance made to the trustees is by patent in the usual form, to their successors or assigns, and payment of purchase price is acknowledged, with no reservations or restrictions. The patent was recorded, both in the land office at Washington, and in the office of the register of deeds for the county in which the land is located.

A part of section 6 of the act, *supra,* is as follows:

"And when final entry is made, the title of the United States to the land covered by such entry shall be conveyed to the trustees for the uses and .purposes heretofore cited."

To this land "final entry" was made, "the title of the United States" was conveyed to the trustees, charged with a trust, but thenceforth all inquiries by the department into the merits of an adverse claim to the tract as a whole, were impossible.

In the conveyance of title by the trustees, they are the grantors.   They do not convey a title held, or purporting to be held, in any manner by the government, but a title resting in themselves.   It cannot be doubted that after a deed issues to a lot claimant by the trustees, he holds the legal title.   But how can the trustees convey a legal title if they do not hold it?

The paragraph immediately following the one quoted from the McDaid case, above, begins by the speaking of "the regulation of the execution of the trust by the secretary," and this accurately defines his functions toward the townsite.   He was no longer taking steps looking to the disposition of a parcel of the public land.   All these powers and functions were exhausted as to this tract when he permitted entry and passed the land to patent. The conclusion is irresistible that the supervisory power which rests in the secretary of the interior, over townsite trustees, arises from the subordinate regulations of such trustees to himself, and not from his general duties in relation to the public lands.   When patent issued, then, for the first time, accrued the rights of a defeated

—19

homestead claimant to call in the aid of a court of equity.

The case of *United States v. Schurz*, 102 U. S. 378, describes in detail the process by which the United States becomes totally and finally devested of its title to land. It is there said, that:

"It was within the province of these officers to sell the land, and to decide to whom and at what price it should be sold; and when, in accordance with their decision, it was sold, the money paid for it, and the grant carried into effect by a duly executed patent, that instrument carried with it the title of the United States to the land—from the very nature of the functions performed by those officers, and from the fact that a transfer of the title from the United States to another follows their favorable action, it must result that at some stage of the proceedings their authority in the matter ceases. It is equally clear that this period is, at the latest, precisely when the last act essential to the transfer of the title has been performed. Whenever this takes place the land has ceased to be the land of the government; or, to speak technically, the legal title has passed from the government, and the power of these officers to deal with it has also passed away. What is the final act which closes the transaction? The act of congress provides for the record of all patents for land in an office, and in books, kept for that purpose. An officer called the recorder is appointed to make and keep these records. He is required to record every patent before it is issued, and to counter-sign the instrument before it is delivered to the grantee. This, then, is the final record transaction; the legally prescribed act which completes what Blackstone calls 'title by record,' and when this is done, the grantee is invested with the title."

The McDaid case is not in conflict with this view of the law. The only question before the court in that

case was whether the decision of the townsite trustees, in a controversy between adverse claimants to the same lot, was final, or whether the secretary of the interior had the power, under the act of May 14, 1890, *supra*, to provide for appeal from such decisions to the department. The court held simply that he had such power, reversing the Oklahoma court, which had failed to make the distinction between the completion of title by record, and the supervisory power of the secretary in regulating the execution of the trust.

To give the ruling in the McDaid case the effect and meaning that the legal title to the land here in controversy was still in the government, after the purchase price had been paid into the treasury; after patent issued in the usual form; after record and delivery to the grantee; after, in short, the final transaction which completes "title by record," would conflict with a rule long established and still in force, the rule as stated in *United States v. Schurz*, having been considered and affirmed since the McDaid case was decided, *In re Emblen.* 161 U. S. 56. If, in this case, the district court sustained the demurrer to the complaint on the first, second, third and fifth grounds, it was reversible error.

Upon the fourth count, that the complaint does not state facts sufficient to constitute a cause of action, it is equally clear that the demurrer should have been overruled.

After reciting in detail the language of the secretary's decision, and following the same line of argument, this court without mention of the admitted and undisputed facts, the fact which entitles plaintiff in error to this

land, assumes that, from his statements made upon other matters incident to the opening of Oklahoma to settlement, the secretary of the interior might evolve his theory of speculation.

The homestead law is here on trial. In this tribunal the door is closed to the consideration of extraneous matters. With the correct and usual application of the law to the facts found, was the plaintiff in error entitled to the land claimed by him as a homestead? and from the undisputed facts, the facts found by the secretary; the facts contemplated by law, the facts alleged in the complaint, admitted by the demurrer and conceded by the court, was it not error in the district court to sustain the demurrer? These are the questions to be decided.

In the opinion, to which I must dissent, it is said:

"All the circumstances connected with the initiation of his right; the condition of the land at the time; its surroundings; its relation to other tracts used for agricultural or townsite purposes; its proximity to a townsite, or to those factors which would necessarily constitute the center of a settlement of those seeking to select lands for townsite purposes, and the probability of its being required for townsite purposes; his knowledge of the land and its surroundings prior to the initiation of his claim to the same; his manner of initiating his right; his prior preparation and subsequent conduct; the fact of his having received or accepted aid or assistance from those who may have entered the Territory before the time prescribed in the proclamation; his use of the land and conduct towards adverse claimants; the adaptability of the tract for agricultural purposes as compared with other tracts that he may have passed over in reaching the same; its location, as relating to government reserva-

tions and the United States land office; its location with reference to railroads and railroad stations, are all proper matters to be considered in determining the purpose of the party in making his settlement, and in determining his good faith."

With my views of the law, I do not understand that a single one of the matters recited, except the use of the land, are proper to consider in determining the good faith called for under the established rule.

"His use of the land" is conceded to be in conformity with law. "His prior preparation" was legitimate, and was suggested to all home-seekers in Oklahoma by the thirty days' notice issued by the president. The "assistance he may have received from his friends," can be considered only with reference to his qualification, and as to whether or not he intentionally violated the law, and he was not disqualified, and the incident cannot affect the *bona fides* of the settlement.

It is further said: "As we understand the decision of the secretary of the interior, as set forth in the exhibit to the complaint, he denies the right of Paine to make homestead entry to the tract in dispute, for the reason that he did not take the land in good faith for homestead purposes, but with the intention of holding the same under the guise of a homestead, knowing that it would be required for a townsite, and that he might speculate off of the townsite settlers. The conclusion is stated by the secretary of the interior that he is convinced from the evidence, that Paine did not take the land in good faith for homestead purposes, as contemplated by the homestead law. If Paine did not take the land in

good faith for homestead purposes, it was then immaterial for what purpose he did take it."

The lack of good faith is based solely upon the untenable theory of specualtion.

The secretary did not find as a fact that Paine did speculate. He only assumes to know what Paine would do with the land after he had acquired title. Until he did acquire title, which he could only do by virtue of his prior right as a settler and subsequent compliance with law, he could do nothing in the way of speculation. After the land was his, he might, as any other homestead settler may do, dispose of it as he saw fit. The theory of speculation, with its imputation of bad faith, is not worthy of serious consideration. To give it judicial sanction is to unsettle the established rule, and, "When the law is uncertain, there is no law."

The court also says: "These facts were, however, considered sufficient by the secretary of the interior upon which to base his conclusion, and the question is not open for our consideration. Having come to the conclusion that there were facts and circumstances contained in the record upon which the conclusion and finding of the secretary might be based, it follows that the complaint did not state such facts as would justify a court in interfering with the decision of the secretary."

The complaint alleges facts agreed to by this court; admitted by the demurrer, and which, it is not to be denied, are the actual and undisputed facts. To recapitulate:  The land was agricultural land, subject to homestead entry.  Plaintiff was the first settler.  He intended the land for his own use and benefit.  He

established a residence with his family and resides there still. These are facts sufficient to constitute a cause of action. They are the facts which force a conclusion of good faith.

The acts of congress and the regulations of the land department treat the good faith of a homestead settler, not as a fact, but as expressing a legal conclusion necessarily arising from the existence of certain facts. The conditions and requirements are named which only must exist as facts to warrant the conclusion.

I hold with my associates that the findings of fact made by the secretary of the interior upon the weight of disputed evidence on the certain subjects made by the law material to the issue in contested land cases, are final; but that, accepting the findings of fact made on these certain subjects, as the facts in this case, then the conclusions and inferences made by the secretary are against equity and good conscience; contrary to usage in the land department; not in harmony with the letter and spirit of the homestead law, and have resulted in denying to a homestead claimant a right to which under the laws of congress he is clearly entitled. This court had the power to say, and I think should have said: "The findings of fact made by the secretary of the interior upon controverted evidence are final, but we find that he mingled with the facts which supported the claim of the plaintiff, inferences and theories, and drew therefrom an erroneuos conclusion; misapplied the law to the facts; misconstrued the law applicable to the case as established in the land department; and has denied the homestead claimant a right which, under a correct construction, would have been conceded to him; and will,

in this action, restore to him the land, which in equity and good conscience and by the laws which congress has made on the subject, is justly his."

It is said in the opinion adopted by this court, that: "Equity delights to do justice, and not by halves." I see no effort here to do any fractional part of equity, nor any application of those principles which underlie the foundation of equity.

I do not believe that the opinion of a secretary of the interior stated as an ultimate conclusion is beyond review by courts of equity; nor that a homestead right may be denied on a "theory," or upon inference; nor that bad faith may be imputed on suspicion; nor that location or value, present or prospective, affects the right of any settler to select any land open to homestead settlement; nor that bad faith may be imputed to the effort of a homestead settler to secure for his home the land adjoining a 320-acre townsite in Oklahoma; nor that a subsequent townsite settlement, without authority of law, can be permitted to outweigh and override the vested rights of a prior settler, though a homestead claimant; and, until a court of last resort in a proper case makes such a ruling, I will not do so.