Argued October 2, reversed October 21, modified on petition for re-
hearing December 23, 1924.

# ALPHA B. McCALLISTER v. SILAS H. McCAL-LISTER.

### (229 Pac. 687.)

**Divorce—False Charge of Adultery is Per Se Cruel and Inhuman Treatment.**

1. False charge of adultery by one spouse against another is *per se* cruel and inhuman treatment, justifying divorce.

**Divorce—Evidence Held Ample to Prove Husband's Charge of Wife's Adultery Unfounded.**

2. In wife's action for divorce, evidence *held* to prove husband's charge of wife's adultery to be unfounded.

**Divorce—$15,000 Gross Alimony to Wife Held Proper.**

3. Where value of husband's property was $50,000 awarding, under Section 513, Or. L., lump sum alimony, to wife aged fifty-two years, $15,000, *held* proper.

See 19 **C. J.** 51, 142, 268.

From Lane: J. W. HAMILTON, Judge.

Department 2.

REVERSED. MODIFIED ON PETITION FOR REHEARING.

For appellant there was a brief and oral arguments by *Mr. C. A. Hardy* and *Mr. H. E. Slattery.*

For respondent there was a brief over the names of *Messrs. Potter, Foster & Immel* and *Messrs. Smith & Bryson* with oral arguments by *Mr. D. H. Foster* and *Mr. E. R. Bryson.*

BURNETT, J.—This is a suit by a wife to secure a divorce from her husband. It is admitted that they

1. Charges of adultery as ground for divorce, see notes in 18 **L. R. A. (N. S.)** 300, 34 **L. R. A. (N. S.)** 361. See, also, 9 **R. C. L.** 345.
3. See 1 **R. C. L.** 929.

were married at Galesburg, Illinois, February 23, 1901, and that about nine years prior to the commencement of this suit in 1921 they moved to Eugene, Oregon, from which time continuously they have both resided in Lane County, of this state. In the amended complaint, upon which the cause was tried, was alleged the marriage and residence of the parties and that the plaintiff has kept to her marriage vows. The plaintiff charges that the defendant was guilty of cruel and inhuman treatment, rendering her life burdensome as follows:

"That the defendant is excessively jealous and of a very jealous disposition, and for several years last past has been, without cause or provocation, excessively jealous of the plaintiff, and generally, in the matter of social relations of the plaintiff with acquaintances and friends, has constantly nagged the plaintiff by claiming that she would be ill thought of and be believed to be guilty of improper conduct; and such jealousy on the part of the defendant has steadily grown worse until during the month of March, 1921, the defendant, without any cause or provocation, accused the plaintiff of being guilty of improper relations and of adultery with a personal friend of the defendant who resides at Eugene, Oregon, and whose name is well known to the defendant, and that the defendant knows who is referred to herein, and the name of the person referred to can be inserted herein if the defendant so requires; and that during the month of March, 1921, the plaintiff herein made a visit to her former home in Knox County, Illinois, and shortly after the plaintiff went to Knox County, Illinois, the defendant followed her to said place and renewed his accusations against the plaintiff, charging the plaintiff with adultery, and demanded that the plaintiff execute an agreement to relinquish any and all dower interest in the defendant's property hereinafter referred to, and providing for a property settlement between plaintiff and defendant; and

threatened the plaintiff that if she did not execute said agreement, that he would sue her for a divorce on the ground of adultery and create a scandal in Eugene, Lane County, Oregon, and cause her to lose her good name and reputation among her acquaintances and friends in Eugene, Lane County, Oregon, and to lose her membership in the church of which plaintiff and defendant were and are members at Eugene, Lane County, Oregon; and the defendant remained in Knox County, Illinois, for several weeks and at Gilson in said county and at Knoxville in said county repeated his said accusations and stated the same to H. Huggins, who was and is a business agent of plaintiff and defendant in Knox County, Illinois, and generally circulated scandalous reports to the effect that the plaintiff had been unfaithful to the defendant; and plaintiff and defendant had resided for many years in Knox County, Illinois, and the plaintiff has a large circle of friends, acquaintances and relatives in Knox County, Illinois, and that the plaintiff is unable to state the names of the other persons other than H. Huggins to whom defendant repeated said accusations, but alleges that the defendant repeated said accusations against the plaintiff to divers persons in Knox County, Illinois, and whose names are known to the defendant and are not known to the plaintiff, and to such an extent that his said charges became known to their acquaintances and to relatives of this plaintiff, and all to her great humiliation."

It is further averred in the amended complaint that the accusation and charges made by the defendant against the plaintiff are wholly false and without cause or provocation, and were made with the purpose and intent of humiliating plaintiff, intimidating her and compelling her to relinquish all her dower interest in the land belonging to the defendant. It is also stated in substance that after the return of the parties to Eugene, from a visit to Illinois, the defendant renewed his demands for a property settle-

ment, removed his effects from their home and has refused and neglected to provide for the plaintiff's support in any manner whatever, so that she has been compelled to labor for her own maintenance. Other allegations follow as to the property owned by the defendant in Illinois. There are no children of the union. The prayer is for the dissolution of the marriage contract and requiring that the defendant be ordered to convey to the plaintiff an undivided one-third interest in the property in Illinois, or pay a gross sum mentioned as permanent alimony and for other relief.

The answer merely denies the charges of the complaint without attempting to justify or palliate them, although some issue is made about the condition and amount of the defendant's property. The Circuit Court refused to grant a divorce and dismissed the suit. The plaintiff appealed.

The plaintiff is fifty-two years of age. The defendant is five years older. They had been married more than twenty years at the commencement of the suit. They were brought up from early childhood on adjoining farms in Knox County, Illinois, and were well acquainted with each other during all that time. It is in testimony that the plaintiff was married June 5, 1892, at the age of twenty-two years to H. M. Bowsin, who was twenty-three years of age, and it is found by construction of a decree for the child's guardianship that to this union there was born a son in less than nine months after the marriage. Bowsin deserted her afterwards and she obtained a divorce from him. On April 21, 1898, at the age of twenty-seven she was married to L. A. Burr, aged thirty-five years. It appears in the testimony that after they had been married some time, Burr demanded that she go to Chicago to live with him and she refused

to do so, and that on this basis he procured a divorce from her for desertion. All these things happened in Knox County, Illinois, and the defendant was familiar with all of them at the time. The parties to this suit were married February 21, 1901, he at the age of thirty-six and she thirty-one. They moved to Eugene, Oregon, about twelve years after their marriage. Arriving there, they were met at the train by I. P. Inman, aged fifty-nine years at the time of the trial, whom the defendant had known from boyhood as an intimate friend. Inman was a married man living in Eugene, being a postoffice employee there for fifteen years and had a family. The two families became quite intimate, living awhile in the same block, called each other by their given names and very frequently visited back and forth from house to house. One season they went together to a seaside resort and occupied the same cottage there. They were often together on picnics and excursions, in fact were more than usually intimate and associated together, all with the consent and participation of the defendant.

Having been absent from her old home and kindred in Illinois for several years, the plaintiff desired to return there for a visit and to look after some property interests in some land which she had in Knox County of that state. According to his own statement to her, the grounds of his objection to her going were,

"Well, because of what some of the men back there know about your life; you would be subjected to temptations, and I won't see a happy moment while you are gone if you go this way by yourself. She said she didn't see why I need to feel that way; she said I was unreasonable; and that is the way the discussion about her going to Illinois ran. * *

. "Later she said, 'I want to go and I am going.'
And I said, 'Go on; we will quit.' She cried and said
she did not want to quit. And I said I didn't want
to quit either. She dropped the matter and didn't
say anything more about it that fall as I recall."

He claims in his testimony to have become sus-
picious of his wife about two years after their mar-
riage when, as he says, she told him about receiving
a visit from a man named Blake in Illinois, at the
State Fair, when he came to spend 'the evening in
her room, and when he was ready to leave they
found the door locked so they stayed in the room all
night. He does not say she admitted having any
improper relations with Blake, and he says that she
told him of a further occurrence when she attended
the State Fair in Illinois, and Blake met her at the
train, told her they could get a room in a private
house to which he took her, and introduced her as
his wife. In this, as in the former instance, he does
not say that she told him that they had any illicit
relations. The plaintiff denies that any such episodes
happened between her and Blake, and denies having
ever told such a story to the defendant. He says that
the occurrences involving Blake and the plaintiff hap-
pened before he and the plaintiff were married; and
that she told him those things about two years after
their marriage. He testified that in discussing the
proposed trip, he mentioned Blake and said to the
plaintiff,

"How do I know if you go back there, that he
won't be with you on part of the trip and pass you as
his wife again?"

He finally gave his consent to her going, after a
good deal of discussion and said:

"I told her she ought to be very careful; that she
was not to have company with a few of those men,—

113 Or.—9

I mentioned Pickerel for one, or there would be talk about it. And she said there would be nothing of the kind; she would be careful and be good; the Lord would help her to be good, and she would come back as soon as she could finish the business, and went on and made me a good promise, and I said I was going to consent for her to go, and I did."

During her absence there was regular correspondence kept up between them and he addressed letters to her in loving terms calling her "Dear Alpha," and usually ending with such phrases as "with love and kisses, Silas."

He testifies that in one letter she wrote about having visited at the Pickerel place, which displeased him greatly. He then set about to devise some plan whereby he could get her to release all claim against his property and consent to a legal separation, failing which he would sue for divorce. He first went to interview Mrs. Inman, to find something derogatory to his wife's character, but got no information of that kind from Mrs. Inman. He then repaired to Inman and asked him what he would tell about his wife. His testimony continues thus on that point:

"And I told him she had told me about this instance with Mr. Blake when they visited at the Fair. And then I turned to Inman and I says, 'She has kissed you?' And he says, 'Don't ask me that.' I said, 'Well, are you going to deny it?' He said, 'Yes, she has,' and held out his hand, and he answered me in three words, 'Yes, she has.' I said, 'I thought so.' I said, 'I am not going to live with her; I have thought these things were true and I am not going to live with her.' "

He then relates a second visit to Inman. Directed by his counsel to use his own language, he says:

"Just what I said: 'You didn't stop at a few kisses, you ―― her.' He said, 'Don't ask me that.' I

said, 'Well, I am asking you that.' He said the second time, 'Don't ask me that.' And when he answered, he said, 'You know I would be denying that before this if I could.' Twice he said, 'Don't ask me that.' "

Going on, he further states that he said to Inman:

"Now I am not going to live with her any more; and Foster has suggested that possibly she will sign an agreement of separation. I am going to Illinois to make an agreement of separation with her and if she signs it, that is the end of it; and if she don't I will sue her for a divorce and I will use you as a witness, and he said not to start a fuss about it."

He then went to his attorney and had him prepare an agreement of separation whereby he and his wife were to release each from any claim on the property of the other, and live apart. Armed with this he started for Illinois without letting his wife know that he was coming, but telegraphed to her foster-brother who was likewise his business agent there to the effect that if his wife had not started to return to Oregon to detain her; that he was coming. Arriving in Galesburg, he first went to this agent and told him that the plaintiff had been unfaithful to him; that he was going to separate from her and wanted to secure her signature to the agreement. He requested to meet her at the house of the agent. The latter declined to have anything to do with it. According to the defendant's statement he went to her place, arriving there a little after 10 o'clock. He then said:

"When we met on the brick sidewalk in front of her door she made a motion with both her hands, and I just put mine up, and I said, 'No, you had to —— Inman." And she said, 'Oh! My God, there is always something.' And I said, 'I see you don't deny the charge.' And she says, 'What I might say now

would not make any difference.' I says, 'You know I would not have made this trip back without I knew what happened.' 'If you will sign an agreement to separate, each keep what they have and go their way, I would much prefer that to a divorce suit, and it would be much less humiliating and much less painful to both of us, if it was settled that way.'

"Q. What did she say? A. She didn't have much to say. Then we turned and walked to the house. She walked to the house and I went after her into the house and wanted to get her decision; she led the way into the parlor and offered me a chair, which I took. I don't just remember what was said that little while, but coming back to the subject of a separation, after dinner was over and the looking at the pigs, as she has told, we went back into the house and I said, 'Are you going to sign this agreement?' She said, 'I don't feel like I realize the meaning of it yet,' I said, 'Will you give me an answer to-morrow?' She said, 'I will try to.' And I said 'All right; I am going down to the farm.' And I went down to where Mr. Wolsey was breaking down stalks, and I visited with him awhile, and then went to another neighors."

He speaks further of seeing her again and demanded that she sign the agreement and she said:

"I might; but want you to understand if I do, that I am not guilty of what you charge me with."

And he says that was the first denial she made of it. She then left for Eugene, and he followed in a few weeks afterwards.

Inman's narrative of the interview with the defendant is as follows:

"Well, he came to my house early one morning,—and I have to get to work at 6 o'clock—probably 15 minutes before 6, and we talked just a few minutes. He told me that his wife,—and he called her some name I have forgotten, either 'that vicious woman,' or something to that effect,—was trying to gouge in

for his property.  He said he was going to try to get
a divorce, and I told him that he should not do any
such thing; to have a reconciliation and make up and
save any disgrace being brought on his own family.
He said, no, he was going to have a divorce.  He
wanted to get me to say something detrimental to her
character, and I declined absolutely; I told him I
didn't want any mixup with trials in court, and tried
to get him to make reconciliation.  He said he would
never live with her again; going back and offer her
a thousand dollars if she would stay in Illinois and let
him return.

"Q. Did he offer you any inducements to assist
him?

"A. He said he would rather pay me than her, and
finally asked me if I ever had any connection with
her.

"Q. What did you tell him?  A. I told him, 'No.
Why do you ask me such a question as that when we
have been such good friends?'  He said, if I would
just say that, whether it was true or not, he could go
to Illinois and bluff her into doing whatever he
wanted her to do.  When I refused to make such a
statement, he said, 'Now, look here, it don't make any
difference if you didn't; I am not after you as to
her; I don't blame you if you did; she is running with
all these other fellows,—Dr. Selover and all these
other fellows.'  He asked me if I would not stand
by him, and I says, yes; and he says, 'Will you
pledge eternal friendship like unto Jonathan and
David?' and I says yes; and we shook hands, and
he says, 'You will stand by me?' and we shook hands.

"Q. Did you understand at that time, he was going
to accuse you,—after you shook hands with him,—
of being intimate with his wife?

"A. No."

The defendant does not pretend to deny the state-
ment of Inman to the effect that if the latter would
just say that, whether it was true or not, he could go
to her and bluff her into doing what he wanted her

to do. Neither does the defendant deny Inman's statement that he was not after Inman, but didn't blame him if he did the adulterous act, and that she was running with all those other fellows, etc. The witness Inman testified that on one occasion about six years before the trial he had kissed the plaintiff while riding with her and her husband and another man in an automobile. He claimed he was very tired and sleepy and the testimony is that she had tickled his nose with a straw or something of that kind and that he awoke suddenly and kissed her, when they were all together riding in the car on the invitation of the defendant. He utterly denied having had any adulterous relations with her whatever and denies telling the defendant any such story.

Her narration of the meeting in Illinois is as follows:

"He arrived on that train that morning, and I saw him coming up the railroad track; when he got just a short distance from the house I went on the porch and called to him,—I says, 'Does it seem good to be back in Illinois again?' He said, 'Not very,' and I noticed by the tone of his voice he was not feeling his natural self. I went down there, walking toward him and extended my hand, and he put up both hands and says, 'Don't touch me; you have been criminally intimate with Inman.' I said, 'My God! What next?' And as we went into the house, I said, 'Life is not worth living!' and he says, 'It hasn't been for me since I married you.' We walked into the front room and he said, 'I have got the dope at last. I have a paper here; if you will sign it, I will sign it; we will each go our way, and there will be nothing more.' He handed me the paper and I sat down in a chair,—I expected to meet him and enjoy his visit there, and not to spring anything like that. I took the paper and sat down in the chair, and I tried to read it, and read it three times before I could get the gist of it; and I said, 'I don't know who has

started this, but I do know that I have never been criminally intimate with Mr. Inman.' He says, 'It is foolish for you to make that statement.' I says, 'The Lord knows whether I am telling the truth.' We sat there and I folded up the paper, and at that time Mrs. Duncan came in and greeted Mr. McCallister, and told him dinner was ready. We ate dinner, and then Mr. Duncan invited him to go out and see the little pigs and the stock on the farm. We went out together, and I asked about mother McCallister, and Mr. Duncan went to the field,—he was breaking cornstalks,—and after he had gone we returned to the house and Mr. McCallister sat down on the davenport in the room, and I sat there by him, and he says, 'Well, are you going to sign this paper?' I says, 'I could not sign that paper now if my life depended on it; you have just taken the life out of me.' I don't know as I can recall the next remark, but the gist was, 'I have tried for the last five years to work in the church and show you I was trying to live right.' He says, 'Before that I suppose you were letting Inman have all he wanted.' I said, 'There is no use for me to talk to you; I shall have to fight my battles alone.' He said, 'When will you sign this paper,—will you sign it to-morrow?' I said, 'We will see what to-morrow will bring.' And he said something about why he had never accused me of being intimate with Mr. Inman before; and I decided the best thing for me to do was to come on home, as it was no pleasure to stay there with him. So I went to Galesburg and made arrangement for my reservation home, went back to the farm that evening and the next day I called Mr. McCallister up and asked him if he would come up, and he came up and said, 'Are you ready to sign that paper?' I told him, 'I wanted to tell you I am going home in the morning.' He said, 'Are you going to sign that paper?' And I says, 'I don't know whether I will or not.' He took his overcoat, and after we got outside on the back porch, I extended my hand, and I says, 'Silas, I hope sometime you will think more of me than you do now.' And he went his way and I

went mine. I took the train at 4 o'clock the next morning and left for Eugene.''

Speaking of his return to Eugene, she says:

''The first intimation I had that he was in Eugene, he and Mr. Foster, his attorney, came to our house; and they came in and sat down, and Mr. McCallister said, 'Well, are you ready to sign that paper?' And I said, 'No.' Mr. Foster says, 'Well, that is all we want to know.' He said, 'Would you suggest any changes in this paper?' I said, 'I do not want to discuss this matter here at all. I will meet you at Charley Hardy's office any time you want to meet me.' ''

Without having pleaded any of the things narrated in his testimony to show any cause whatever for having made the statement imputed to him, charging his wife with adultery, the defendant in his testimony narrated a great many things that people had told him about transactions of his wife. For instance, he said in Illinois he talked with John Perkins who told him that Bob Sinclair had acknowledged that he, Sinclair, had had improper relations with the plaintiff, and that Jim Powell said:

''Delbert Evans told me he had had sexual intercourse with her more than once before she was married.''

The defendant admits having brought Perkins out from Illinois to attend at the trial. He says that in Illinois he gave Perkins $5 and told him he would give him $10 if Sinclair in his presence would make the statement imputed to the latter. Sinclair appeared as a witness and gave his deposition before a commissioner in Illinois and testified that he had never at any time or place had any improper relations with the plaintiff, although he had worked for her on her farm, off and on, during the years

1910, 1911 and 1912 after she was married to the defendant. He denied telling Perkins that he had had intercourse with the plaintiff. As an impeaching question, he was asked in substance if he didn't have a talk with one Scott Steepleton in March, 1921, in which he told him that he had told John Perkins that he had had intercourse with Mrs. McCallister. He denied the statement, but Steepleton was not called as a witness.

The defendant counts also in his testimony on the conduct of the plaintiff with their family physician in Eugene. He himself says, however, he never suspected her of illicit relations with the physician, but only thought she was too attentive to him. One instance concerning the physician is about as follows: On one occasion two cousins of the defendant, a man and woman, were visiting him in Eugene. The man took suddenly very sick and the family physician was called to attend him, making two visits there. The woman cousin says, speaking of the physician:

"I thought way down in the bottom of my own heart she was a little indiscreet."

Asked to describe her manner towards the doctor she answered:

"No, I would simply state the one word, and that is she was very indiscreet. I cannot go into detail."

The only answer she could be induced to give was that she was indiscreet. The cousin who was sick testifies about his illness and the call of the doctor and pertinaciously, over the objection of the defendant's counsel, he testified:

"I called another doctor in and he examined me and prescribed for me and while there, she didn't do anything you could say was specific, but as the thing came up afterwards, when I was going back to Portland with a cousin of mine, we mentioned the fact

on the train. I drew the conclusion that Mrs. Mc-
Callister was probably showing the doctor too much
attention.''

The witness could not remember the name of the
doctor and could only give a vague description of him.
The following occurred at the cross-examination of
this witness:

"Q. How many times have you been arrested for
selling whiskey contrary to law in this county? A.
That don't apply to this case.

"Q. How many times have you been fined in this
county for selling whiskey contrary to law? A. Look
it up.

"Q. That is the answer you want to make? A. Yes,
sir.

"Q. Isn't it true that you have been repeatedly
fined in this county for selling whiskey in violation
of the law? A. Go ahead and look it up.

"Q. Isn't that true? A. Look it up.

The defendant admits that he stayed in Illinois
some weeks after his wife returned to Oregon, and
while there told his story to various people, accusing
her of adultery. He admits he told it to twenty or
twenty-five of their former acquaintances in that state.
Among others he told it to the man Pickerel whom he
warned his wife against visiting. He makes no in-
timation whatever that there was any improper
conduct whatever between her and Pickerel. She
explained that she visited the latter's house a day or
two with his daughter and her husband. She went
there to see if she could sell her land to Pickerel who
owned an adjoining tract; and says that Pickerel
was there not more than two hours during her whole
visit. She strenuously denies that she ever had any
illicit relations with anyone since their marriage.
The only incident appearing in testimony at all preju-
dicial to the plaintiff's character is the fact that her

child was born in 1892 less than nine months after her marriage, irrespective of the fact that legitimate births sometimes happen prematurely, and what inference some prudish mind might draw from the fact that Inman, the intimate friend of herself and husband, in a mere innocent romp in the car in the immediate presence of her husband, had kissed her. Although he had known the plaintiff from her early childhood, continuously up to the time he married her in February, 1901, the defendant called some witnesses in Illinois who testified that in 1891, 1892 and 1893 the plaintiff's reputation in that community for chastity was bad. Others who knew her equally well testified that it was good. No attempt was made to attack her reputation in that respect after her marriage. Mrs. Inman testifies unequivocally in her favor and warmly upholds the plaintiff's reputation for chastity.

The testimony shows that the defendant was very niggardly about contributing to his wife's support, and at one time she suggested that she could get a position in some physician's office and he told her that if she took such a position she could not live with him.

It would extend the record too much and would not add anything of importance to the judicial literature of the state to recount the testimony further.

As stated, the defendant simply denied the charges of the complaint. He pleaded nothing in confession and avoidance. He gave the plaintiff no notice whatever in his pleadings that he would rake up every trivial incident in her whole life with which to plague her in this litigation. In support of the general issue he put in not only the vaporings of his jealous mind, but also all the idle gossip that other people had told him as coming from third

parties. Concerning such a situation, this court has laid down a rule in *Herberger* v. *Herberger,* 16 Or. 327 (14 Pac. 70), concerning the requisites of proof in such a case as follows:

"A somewhat careful review of all of the evidence does not lead to this conclusion; but on the contrary, it only tends to prove and establish that those parties kept up and maintained the usual and common amenities of social life between like relations in their condition and situation. Because they were sociable the court will not presume evil, and because they had the opportunity and might have committed adultery, there is no presumption that they did. The presumptions are the other way. The law will not presume that these parties violated the criminal statutes of the State, and transcended their social duties, or were guilty of any wrong. He who alleges it must prove it; opportunity alone will not suffice. (*Pollock* v. *Pollock,* 71 N. Y. 137.) Of course, direct proof is rarely attainable, and is not necessary; but where circumstances are relied upon they ought to be such as to lead to the conclusions of the adulterous intercourse, not only by fair inference, but as a necessary conclusion. Appearances equally capable of two interpretations, one an innocent one, will not justify the presumption of guilt. (*Pollock* v. *Pollock, supra.*) But in this case there is not enough to require the rule to be invoked. There is nothing but the vaguest, and so far as appears, the most unreasonable and groundless suspicion."

There are many precedents to the effect that a charge of adultery is not cruelty, when not accompanied with physical violence, but for the most part, those are instances where the charge is made to the offending spouse alone, and is not repeated in the presence or hearing of others. The great weight of authority is that where such a charge is not only made without foundation, but is published in the presence and hearing of others, it does amount to

cruelty. This is the rule in this state: *Smith* v. *Smith,* 8 Or. 100; *McMahan* v. *McMahan,* 9 Or. 525; *Eggerth* v. *Eggerth,* 15 Or. 626 (16 Pac. 650); *Herberger* v. *Herberger,* 16 Or. 327 (14 Pac. 70); *Crow* v. *Crow,* 29 Or. 392 (45 Pac. 761). See, also *Reinhard* v. *Reinhard,* 96 Wis. 555 (71 N. W. 803, 65 Am. St. Rep. 80, and note); *Wagner* v. *Wagner,* 36 Minn. 239 (30 N. W. 766); *Miller* v. *Miller,* 89 Neb. 239 (131 N. W. 203, 34 L. R. A. (N. S.) 360); *Palmer* v. *Palmer,* 45 Mich. 150 (7 N. W. 760, 40 Am. Rep. 461); *Carpenter* v. *Carpenter,* 30 Kan. 712 (2 Pac. 122, 46 Am. Rep. 108) *Haight* v. *Haight* (Iowa), 82 N. W. 443; *Jones* v. *Jones,* 60 Tex. 451; *Bahn* v. *Bahn,* 62 Tex. 518 (50 Am. Rep. 539); *Graft* v. *Graft,* 76 Ind. 136; *Clark* v. *Clark,* 86 Minn. 249 (90 N. W. 390); *Lyle* v. *Lyle,* 86 Tenn. 372 (6 S. W. 878).

The defendant relies upon *Boon* v. *Boon,* 12 Or. 437 (8 Pac. 450), as justification for his conduct in accusing his wife of .adultery to her face. In that case there was no charge that the defendant had accused his wife of adultery. The plaintiff herself testified that her husband never accused her of unchastity or improper or criminal relations with other men, and as appears by the opinion in the case, she said when asked by a neighbor what her grounds were for expecting divorce,

"that Mr. Boon objected to her going where she pleased, and with whom she pleased, and that she thought a woman had a perfect right to do as she pleased, and go with whom she pleased."

Various acts of the plaintiff in the Boon case were in evidence showing that she had done unladylike and imprudent things and the only evidence offered against the defendant was that he had remonstrated with her about such conduct. Under these circumstances

the court very properly held that she was not entitled to relief.

The defendant also relies upon *Hawley* v. *Hawley,* 101 Or. 649 (199 Pac. 589). In that case the plaintiff wife in her amended complaint made a heinous charge against the defendant. He made this a basis of a supplemental cross-complaint, relying upon it as an offense resulting in making his life burdensome and sought affirmative relief on that theory. The court in an opinion by Mr. Justice BROWN, reversed a decree in his favor on the ground that there was nothing to show that the charge was made maliciously or without probable cause. The charge was not one of adultery.

1, 2. The rule is well established in this state that a false charge of adultery made by one spouse against another is *per se* cruel and inhuman treatment justifying a divorce. The evidence is ample in this case that the charge was without foundation. Indeed, the defendant has not had courage enough to reiterate the charge in his pleading. Neither does he allege any palliating circumstances excusing his avowed and widely published attack on his wife's chastity. He has contented himself with going about as if with a muck-rake and resurrecting the possible youthful indiscretion of his wife resulting in the premature birth of her child, and bringing in the testimony of a few prudish old women, that as far back as 1891, ten years before he married her, her reputation for chastity was not good. He admits peddling about in Illinois to twenty or twenty-five of their acquaintances his charge that his wife had committed adultery without asking for any explanation or making any remonstrance against her conduct, in which according to his own testimony he charged her with criminal intimacy with his friend.

If it were necessary under our own precedents to prove malice, such conduct would abundantly establish it. There is no testimony in the record upon which a charge of adultery could be based. When a man charges his wife with adultery he ought to be prepared to prove it or take the consequences of such a charge. The parties have not been seen in any compromising situation. During their residence in Eugene the defendant's mother lived with them, and in her capacity of duenna, the utmost she can say as a witness against the plaintiff is that on a few occasions when Inman called there, the plaintiff, as he left, would go with him as far as the porch and talk awhile. Of course the mother, in common with the other female relative already quoted, adds her opinion that the plaintiff was indiscreet. The association of the plaintiff with all the people named since her marriage has been invariably in the presence of other parties. Her reputation since her marriage for chastity has been abundantly supported. Only the most fervid and jaundiced imagination could picture any wrongdoing on her part. She has been conspicuously active in church work and other good deeds since her residence in Oregon. To judge her harshly on the flimsy testimony, hearsay and otherwise, that has been dragged into this case, would be to "shut the gates of mercy on mankind." After living with the plaintiff for more than twenty years, biding his time when defendant thought, as he said, "that he had the dope on her," his jealous disposition has carried him into making the false accusation against his wife that she was guilty of adultery. And not only so, but also, without dispute, he has shown a willingness to purchase testimony and to promote an unfounded statement for the purpose of bluffing the plaintiff into releasing his property from any

claim on her part. Under the well-settled rule in this state, the conclusion is that she is entitled to a decree of divorce.

3. It remains to consider the question of alimony. It is said in Section 513, Or. L.:

"Whenever a marriage shall be declared void or dissolved, the court shall have power to further decree as follows:— * *

"3. For the recovery of the party in fault such an amount of money, in gross or in installments, as may be just and proper for such party to contribute to the maintenance of the other."

It is said in *Musselman* v. *Musselman,* 44 Ind. 106, speaking of the wife:

"Where the divorce has been granted to her on account of the misconduct of the husband, the rule is, that she should not be placed in a worse condition than if she had survived her husband; otherwise the husband would be permitted to take advantage of his own wrong."

The defendant himself testifies that he has in Knox County, Illinois, 187 acres of land in severalty, and that he has a half interest in an additional 90 acres. The other half is owned by his widowed mother, an old lady of 81 years of age, and he is her only child. She has a dower in the 187 acre tract. Substantially, therefore, he is the owner of 277 acres. The least valuation put on the tract is $200 per acre. He admits in his pleadings that he has personal property in bonds, war-saving stamps, and cash, to the amount of $3,000. He pleads that his interest in the real property is worth $35,000. He does not testify as to the value per acre of his land, but other witnesses do. Considering all the testimony, we may safely put the value of all his property at $50,000. The plaintiff has passed the meridian of life, and the defendant

ought not to be allowed to cast her off without contributing to her maintenance. His land, constituting the great bulk of his property, is in another state: We will not pause to determine what would be the effect of a decree in this state requiring him to convey to her an undivided one third of that land. It is suggested in argument that he has departed from this state, but it appears by the record that the courts of this state have obtained jurisdiction over him.

In the light of these circumstances, it is proper that the court should award her a money alimony in gross. Considering the amount of his property and the baseness and baselessness of his charge, we think she is entitled to recover from him as alimony in gross the sum of fifteen thousand dollars ($15,000).

It is not necessary to decide whether the Circuit Court erred in refusing permission for the plaintiff to file a supplemental complaint alleging desertion which accrued *pendente lite.*

The decree will therefore be entered that the marriage contract heretofore existing between the plaintiff and the defendant is dissolved; that the plaintiff have and recover of and from the defendant the sum of fifteen thousand dollars ($15,000) as alimony in gross, together with the costs and disbursements of this suit, both in this court and in the Circuit Court.

The decree of the Circuit Court is reversed.

REVERSED.   MODIFIED ON PETITION FOR REHEARING.

BEAN, BROWN and COSHOW, JJ., concur.